No. 106,689

STATE OF KANSAS, *Appellee*, v. DELBERT McBROOM, *Appellant*.

(325 P.3d 1174)

Opinion filed June 6, 2014.

*Gerald E. Wells*, of Lawrence, argued the cause and was on the brief for appellant.

*Natalie A. Chalmers*, assistant solicitor general, argued the cause, and *Andrew D. Bauch*, assistant attorney general, was on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Delbert McBroom was convicted of one count of first-degree murder, one count of aggravated burglary, and one count of burglary. On appeal, McBroom argues that (1) the district court erred when it denied his change of venue motion; (2) the State presented insufficient evidence to convict him of the crimes charged; and (3) cumulative error deprived him of a fair trial. Based on the analysis below, we reject each of McBroom's arguments and affirm his convictions.

## FACTS

This is a companion case to *State v. Wilson*, 295 Kan. 605, 289 P.3d 1082 (2012).

Scott and Carol Noel lived in rural Osborne County on West 20th Drive. Scott was a farmer and cattleman; Carol worked at a bank in Smith Center. Scott's daily routine included doing chores in the morning and then returning home around the noon hour for lunch. On March 25, 2008, Scott left the couple's residence sometime between 7:15 a.m. and 7:30 a.m. to do chores. Carol left for Smith Center shortly thereafter.

Elinor Fink Clark lived at a residence that was located a couple of miles northeast of the Noel residence. At approximately 11 a.m. on March 25, Clark left her residence. After spending some time at the senior center in Downs, Clark returned to her residence at 1:45 p.m. When Clark went into her kitchen, she noticed that paperwork she had placed in an envelope and left on the kitchen table was now spread out over the table. Clark walked into her bedroom and saw that it was in complete disarray—drawers had been removed from a dresser and her clothes were scattered all over the floor. After calling 911 and reporting that her house had been ransacked, Clark went around her house and determined that jewelry, cash, German coins, and a pillowcase were missing. Law enforcement later arrived at Clark's residence to investigate. During the investigation, a cigarette butt was found in Clark's front yard. Notably, Clark was not a smoker.

At 3:45 p.m. that day, Carol left the bank in Smith Center and arrived home sometime between 4 p.m. and 4:15 p.m. As she drove up the lane, Carol saw that Scott's truck was parked in his usual spot near the sidewalk to the backdoor of their house. When Carol walked into the house, she saw that chairs in the dining room were toppled over and that the tablecloth on the dining room table was pulled partly off. Carol walked into the kitchen through the dining room and saw her husband's body lying on the kitchen floor with his hands tied behind his back. She called 911 and reported that her husband had been murdered.

Law enforcement officers arrived at the residence and saw that Scott's body was lying face-down on the kitchen floor. A large pool of blood surrounded the body. Scott's hands were tied behind his back with a power cord. The cord appeared to be tightly wound around his wrists. Scott had a shotgun wound to the back of his head and upper neck.

On the table in the kitchen was Scott's 12-gauge shotgun with a spent shotgun shell inside the chamber. According to Scott's son, Jason, Scott stored the shotgun in a cabinet near the kitchen. Jason also said that the shotgun was always kept unloaded when it was stored inside the cabinet.

Agents from the Kansas Bureau of Investigation (KBI) assisted local law enforcement with the investigation of the murder. A KBI investigator conducted a blood splatter analysis of the crime scene and determined that Scott was shot while lying in roughly the same position as he was found. A pathologist determined that the cause of death was a shotgun wound to the back of Scott's head and neck. Based on the appearance of the entrance wound, the pathologist believed that the shotgun was in contact with the back of Scott's head when it was discharged.

While officers were conducting their investigation of the crime scene, it appeared to them that someone had rummaged through drawers and other things inside the residence. Furniture in the dining room area had also been knocked over. Most notable, though, was the officers' discovery of a cigarette butt lying on the floor of the Noels' sun room. Neither Scott nor Carol smoked, and no family members or guests ever smoked inside the home.

People driving in the area of the Noel residence around the noon hour reported seeing a suspicious vehicle. Bradley Davis stated that at approximately 11:45 a.m., he was driving west on West 20th Drive towards the Noel residence when he noticed from about 100 yards away a "four-door smaller vehicle" pulling out of the Noel driveway and turning west on West 20th Drive. Davis said that the vehicle was traveling faster than normal—between 20 and 30 miles per hour—when it pulled out the Noel driveway. Davis also thought that the vehicle looked out of the ordinary because he had never seen it before. He knew it was not a vehicle that would normally be seen leaving the Noel driveway.

Davis followed the vehicle westward on West 20th Drive until the road intersected with Highway 281. There, the vehicle turned north onto Highway 281; Davis turned south.

At McBroom's trial, Davis had the following exchange with the prosecutor concerning the vehicle he saw:

"Q. Okay. Give us the best description that you can of that vehicle.

"A. I thought it was a General Motors-type of vehicle, I wasn't really sure which brand, but it was kind of a smaller four-door car, kind of older, not very good shape at all.

"Q. What do you mean by that when you say not in very good shape?

"A. The paint was kind of faded, or oxidized, and kind of dirty, and like maybe there was a hubcap or two missing off it. It looked like the trunk lid wouldn't totally stay shut, so it was kind of basically an old junker car.

"Q. When you say it looked like the trunk lid wouldn't completely stay shut, can you describe exactly what you mean by that?

"A. As I was following it down the gravel road, the lid would bounce up and down just slightly as I was following it, like the lock or latch wouldn't work.

"Q. What color, do you recall?

"A. It was kind of a bluish-gray.

"Q. Were you able to make any observation of the license plate of the vehicle?

"A. I didn't really pay attention to the license plate, I guess."

With regard to who he saw inside the vehicle, Davis stated he could only see one person inside the vehicle. In describing this person, Davis stated:

"He was a male. I couldn't really tell the height. His shoulders and head were above the seat of the, or the back of the front seat of the vehicle, so I couldn't really see very much of the driver, but looked like he had some facial hair and wearing a hat, looked like a middle aged male."

Davis described the man's hat as a baseball hat. Later, on cross-examination, Davis confirmed the man as being "dark-skinned, un-shaved."

At approximately 11:50 a.m., Brad Roadhouse was traveling south on Highway 281 towards Osborne when he passed the intersection of Highway 281 and West 20th Drive. As he approached and passed the intersection, he saw an older "mid-size sedan-type vehicle" slowly traveling east on West 20th Drive towards the Noel residence. He estimated that the vehicle was about an eighth of a mile east of the highway when he saw the vehicle. Roadhouse said that the vehicle did not look "roadworthy" and said that the trunk lid of the vehicle was not "very well latched" because it bounced up and down as the vehicle traveled down the road. Finally, Road-house described the vehicle's color as "probably gray to light blue."

Sometime between 11:35 a.m. and 11:40 a.m., Jeffrey Benson, a delivery driver for AmeriPride, left the town of Osborne and began traveling north on Highway 281 towards Smith Center. As he was driving on the highway, Benson was passed by an "older, four-door, bluish-gray car," which he thought looked "pretty un-safe." As the car passed him, he looked down and saw a person

sitting in the passenger seat. Benson described this person as between 38 and 50 years old with "stringier hair" and wearing glasses that "seemed like they were bigger than what they should have been for his face." Based on his arrival time of 12:03 p.m. in Smith Center, Benson estimated that the vehicle passed him on the highway at approximately 11:50 a.m.

In an effort to identify the man that Benson saw, Benson was later shown a photo lineup which included McBroom's picture. Benson did not pick out McBroom's picture.

Based on the burglaries occurring at the Noel and Clark residences, law enforcement agencies in western Kansas and southern Nebraska were contacted about whether they had experienced any recent burglaries occurring at rural residences. Responses were received from Ness, Lane, and Gove Counties in Kansas and Clay and Gosper Counties in Nebraska. Subsequently, the KBI asked the agencies that responded to determine whether cigarette butts were present at the crime scenes.

Law enforcement officers investigating a March 24 burglary taking place at a rural residence in Clay County, Nebraska, reexamined the crime scene on March 27 and discovered a cigarette butt in the yard. The homeowner did not smoke. The butt was collected and turned over to the KBI. A subsequent analysis confirmed that the DNA present on this cigarette butt was the same as that present on the cigarette butt recovered from the Noel residence. Furthermore, a search of a DNA database showed that it matched Kenneth Wilson's DNA.

Based on this DNA match, law enforcement began a surveillance in mid-May 2008 of the Wilson residence in Salina. Coincidently, on May 15, 2008, McBroom and his wife, Enola, parked an RV in the Wilson backyard. Law enforcement determined that the couple was living out of the RV. Prior to this, McBroom and Enola had been living at a nearby residence. During the surveillance, law enforcement observed McBroom going in and out of the Wilson residence.

On May 23, 2008, law enforcement searched Wilson's trash and found several documents addressed to either Wilson or McBroom. One such document was a letter addressed to Wilson from the

Missouri Highway Patrol dated May 15, 2008. The letter advised Wilson that his 1987 Pontiac Bonneville had been towed from the side of a highway and was now stored at the towing company's place of business in Mound City, Missouri.

A trooper with the Missouri Highway Patrol later confirmed that the Bonneville had been left on the side of Highway 159 in Missouri. The car was "tagged" by the highway patrol in April 2008 and eventually towed from the side of the highway in May.

A KBI agent traveled to Missouri and conducted a search of the Bonneville on June 2, resulting in the discovery of a receipt from Walmart, cigarette butts, a pay stub issued to a Lissa Robles, a lien release from the Kansas Department of Revenue issued to Robles, a photocopy of the vehicle's title, and an insurance card identifying Wilson as the insured. The car also had a Kansas 30-day temporary tag. The vehicle was taken back to Kansas. Notably, the KBI agent who conducted the search of the vehicle stated that depending on the light in which it was seen, the Bonneville appeared to be either light blue or silver in color.

Robles later confirmed that Wilson had purchased the Bonneville from her. Robles said that though she transferred the car's title to Wilson on March 19, 2008, Wilson had possession of the car 2 to 3 days prior to that date. Robles said that Wilson paid her in cash for the vehicle on March 19.

Based on the information contained on the Walmart receipt recovered from inside the Bonneville, law enforcement was able to obtain video footage showing Wilson on March 24, 2008, driving the Bonneville into the parking lot of a Walmart in Fairbury, Nebraska. The video showed Wilson walking into the Walmart and purchasing three, two-bottle packages of small propane bottles.

On June 26, 2008, pursuant to a warrant, law enforcement searched the Wilson residence as well as the McBroom RV. Inside the Wilson residence, law enforcement found: (1) items stolen from a residence in Gove County, on March 12, 2008; (2) items stolen from a residence in Beeler, on March 12; (3) items stolen from a residence in Gosper County, Nebraska, on March 14; (4) items stolen on March 24 from a residence in Clay County, Nebraska, where Wilson's DNA was found on a cigarette butt; (5)

items stolen from another Clay County, Nebraska, residence on March 24; and (6) items stolen from Clark's residence in Osborne County on March 25. Inside the McBroom RV, law enforcement found a Sony PlayStation and controllers that were stolen from the residence in Gove County on March 12. Subsequently, McBroom turned over a camcorder to law enforcement that was also taken from the Gove County residence on March 12.

McBroom made several statements regarding his whereabouts between February and April 2008. On June 24, 2008, 2 days before law enforcement searched the RV, McBroom told KBI agents about making two trips to Missouri by himself but later said that Wilson accompanied him on these trips. McBroom explained that they traveled to West Plains, Missouri, for the purpose of looking for land suitable to grow ginseng. McBroom was also asked whether he had traveled to western Kansas to look for employment. He denied doing so.

McBroom also told the KBI agents that sometime in February or March 2008, he and Wilson got into an automobile accident in Colorado while traveling to Las Vegas. An agent checked with McBroom's insurance company to verify this information and determined that the accident occurred on April 5, 2008, and was reported to the insurance company on April 8.

McBroom was questioned by law enforcement a second time on July 28, 2008. During this questioning, McBroom stated that he took four different trips with Wilson during the first part of 2008. Contrary to his first statement to law enforcement, McBroom stated that between late January and early February 2008, he and Wilson traveled to western Kansas to look for work on drilling rigs around the Hill City and Colby areas. With regard to the route they traveled, McBroom only said that they traveled on Interstate 70.

For the second trip, McBroom said that he and Wilson traveled to southern Missouri in February 2008. McBroom again explained that the purpose of this trip was to look for land suitable to grow ginseng. For the third trip, McBroom said that they traveled to Las Vegas to gamble sometime in March. McBroom again said that they got into a traffic accident in Colorado while traveling to Las

Vegas. McBroom also said that while they were in Las Vegas, he received a phone call from Enola telling him that her father had passed away. McBroom said that they returned home after receiving the call. Finally, for the fourth trip, McBroom simply said that he and Wilson left on a Wednesday and traveled east on Interstate 70 into Missouri to an unknown location and then turned north. McBroom said that on this trip, Wilson's car broke down, so they had to call Enola to come to Missouri and pick them up.

McBroom told law enforcement that when he and Wilson took these trips, they usually spent the night in the vehicle at public lakes or rest areas. McBroom said that they would purchase food at a store and prepare it on a camp stove.

During this questioning, McBroom was also shown the video footage of Wilson going into a Fairbury, Nebraska, Walmart on March 24, 2008. After viewing this footage, McBroom denied being with Wilson at the time or ever having been to Nebraska. McBroom was also asked about the stolen PlayStation that was found in the RV. McBroom claimed that Enola had purchased the PlayStation for him at a Game Stop in Salina. Finally, when asked, McBroom claimed he could not remember where he and Wilson were between March 24 and 25, 2008. McBroom specifically denied being in Osborne County in March 2008.

McBroom spoke with law enforcement a third time on August 15, 2008. During this interview, McBroom gave more details regarding the trip he and Wilson took sometime in January or February 2008 to western Kansas for the purpose of looking for work on oil rigs. McBroom said that on the first day of the trip, they traveled from Salina and spent the night at Wilson Lake. The next day, they traveled to the towns of Victoria, Plainville, Hill City, and Ness City to file applications with oil drilling companies. They spent the second night of their trip at a small lake, which McBroom described as being "right off of I-70" between WaKeeney and Oakley. On the third day, McBroom said that they traveled to Colby to file applications with other oil drilling companies. That night, they again spent the night at the lake between WaKeeney and Oakley. The next day, they returned to Wilson Lake and spent the night there before returning home.

McBroom also gave more details regarding the trip to Las Vegas that he and Wilson took. McBroom said that on the way to Las Vegas, he and Wilson got a job on an oil rig in eastern Colorado. McBroom said that they were paid $15 an hour as well as a $50 per diem. Interestingly, McBroom said that after working on the oil rig for 4 days, he and Wilson were jointly paid $4,500. When a KBI agent told McBroom that their hourly rate would not amount to $4,500 in joint pay, McBroom said that they actually received around $1,800. They then proceeded to Las Vegas where they gambled and won more money, resulting in them having a total amount of $4,500. McBroom said he used his share of the money to purchase the RV. Similar to his previous statements, McBroom said that during this trip, they got into a car accident, but he identified the location of the accident as Vail, Colorado. He also said that during the trip, he received a call from Enola informing him that her father had died.

During this interview, McBroom was asked whether he and Wilson took a trip during the week of March 24, 2008. McBroom said that they did but that they left Salina on March 26, which was a Wednesday.

On August 16, 2008, McBroom called the KBI agent who had interviewed him the previous day and told the agent that he had spoken to Enola and determined that he had made mistakes regarding when certain trips had taken place. McBroom said that between March 10 and 14, 2008, he and Wilson were in Missouri. McBroom said that while they were in Missouri, he had collected newspapers from West Plains, Missouri. Notably, when law enforcement searched Wilson's trash on May 23, 2008, they collected three newspapers from West Plains dated February 18, 20, and 21, 2008. McBroom also said that it was during this trip on March 14 when he received a call from Enola telling him that her father had died.

McBroom also said that he and Wilson took a second trip to Missouri between March 26 and March 29, 2008. McBroom said that on March 29, Enola had to come to Missouri to pick them up because Wilson's car broke down.

Finally, McBroom said that he and Wilson worked on the oil rig in eastern Colorado between April 1 and April 4, 2008. He also said that after checking with his insurance company, he determined that the car accident in Colorado took place on April 5, 2008.

McBroom spoke with law enforcement for a fifth time on May 20, 2009. At this interview, McBroom said that he and Wilson traveled to Missouri sometime between January and February 2008. McBroom said that after speaking with Enola, he determined that he and Wilson left for their second trip to Missouri on Tuesday, March 25, 2008. McBroom said that during this trip, he was with Wilson the entire time except for one time when they were at a lake in Missouri and Wilson went somewhere to purchase propane canisters.

Finally, at McBroom's trial for the March 12, 2008, burglary and theft of the residence located in Gove County, McBroom testified that he and Wilson traveled to northwestern Kansas in February 2008 to look for work on drilling rigs. Between February and March 2008, McBroom said that he and Wilson traveled to Missouri. During the first week of their trip, McBroom said that they stayed together, but during the second week, Wilson left McBroom behind—presumably in Missouri—to go to Oklahoma. McBroom said that they returned from this trip on March 14, the day Enola's father died. Wilson said that they took a second trip to Missouri on March 25 and returned either on March 29 or March 30. Despite McBroom's testimony, he was found guilty of the March 12 burglary and theft. See *State v. McBroom*, No. 103,620, 2011 WL 4357802 (Kan. App. 2011) (unpublished opinion).

In January 2010, after Wilson was convicted in Osborne County of premeditated first-degree murder, aggravated burglary, burglary, and criminal possession of a firearm, see *State v. Wilson*, 295 Kan. 605, 606, 289 P.3d 1082 (2012), the State filed a seven-count complaint against McBroom, which was later amended in November 2010 to four counts: alternative counts of premeditated first-degree and felony murder of Scott Noel, one count of aggravated burglary involving the Scott Noel residence, and one count of burglary involving Elinor Clark's residence. Prior to trial, the State filed a motion pursuant to K.S.A. 60-455 to present evidence of

McBroom and Wilson's involvement in the March 12, Gove County burglary as well as evidence of the other burglaries occurring at rural homes during the dates of March 12-14 and March 24, 2008. The district court granted the motion, finding that evidence of the other burglaries was relevant to prove identity and/or the plan used to commit the March 25 burglaries in Osborne County. The jury was given a limiting instruction regarding the other crimes evidence.

In April 2011, McBroom's case proceeded to trial where, in addition to the above mentioned facts, the State presented the following evidence regarding the prior burglaries:

- Tracy Noel testified that her rural Gove County residence was burglarized sometime between 7 a.m. and 12:30 p.m. on March 12, 2008. Among the items taken from the residence was a pillowcase. As mentioned above, items taken from the Noel residence were later found in the Wilson residence and the McBroom RV. McBroom was convicted of burglary of the Tracy Noel residence.

- Bernice Blakeley testified that her rural residence near Beeler was burglarized sometime during the afternoon of March 12, 2008. Among the items taken from her residence were pillowcases. When Blakeley's husband arrived home that evening, he noticed that his .270 caliber rifle was out of his closet (where he normally kept it), loaded, and sitting on top of a deep freezer. Items taken from Blakeley's residence were later found in the Wilson residence.

- Loa Hagelgantz testified that around 10 a.m. on March 13, 2008, she returned to her rural residence north of Bazine and saw an "older gray car" with a "square-ish" look" drive around the north side of her house. Hagelgantz walked up to the car and spoke to the driver, the car's only occupant. The driver—who Hagelgantz described as a white, middle-aged male and later identified in a photo lineup as Wilson—explained that he was looking for gas and asked how to get to the nearest town. After getting directions, the man left. As the car was leaving, Hagelgantz looked at the license plate and could tell the car

was from the "Salina area"—presumably meaning that the car had a Saline County tag. She could not, however, read the numbers on the license plate because it was covered in mud.

When Hagelgantz walked into her home, she noticed that a door she had closed prior to leaving was now open, she smelled cigarette smoke in the kitchen (neither Hagelgantz nor her husband smoked), and she saw scattered CDs and mud on the family room floor. A couple of days later, Hagelgantz noticed that the purse she carried to work and her granddaughter's little wooden baseball bat were missing. A year later, Hagelgantz and her husband found these items in the windbreak west of their residence.

- Matthew Andrews testified that his rural residence north of Elwood, Nebraska, (in Gosper County) was burglarized sometime between the morning and early afternoon of March 14, 2008. When Andrews returned home sometime between 2 p.m. and 3 p.m., he noticed the smell of cigarettes. No one living in the Andrews home smoked. Among the items taken from the Andrews residence were a pillowcase and $7,000 to $8,000 in cash. Items taken from the residence were later found in the Wilson residence.
- Tara Pope testified that her rural residence in Clay County, Nebraska, near Saronville, was burglarized sometime during the day on March 24, 2008. Items taken in the burglary were later found in the Wilson residence. Two cigarette butts were recovered outside of the Pope residence.
- Joel Livgren testified that his rural residence in Clay County, Nebraska, near Clay Center, was burglarized sometime during the day on March 24, 2008. Among the items taken was a pillowcase. Property taken during the burglary was later found in the Wilson residence. Three cigarette butts were recovered outside of the Livgren residence. It was later determined that one of these cigarette butts had Wilson's DNA on it.

At trial, Sharon Wilson—Wilson's wife and McBroom's cousin— testified that Wilson and McBroom were "really good friends" who were always together and "did everything together." She also said

that both men were smokers. Sharon stated that in March 2008, the men were unemployed and that on March 23 or March 24, they left Salina on a trip. The men told her that they were driving to western Kansas to look for work in the oil fields. Wilson returned home from this trip on March 29 around 3 a.m.

Sharon said that in May 2008, the McBrooms parked their RV on the property she shared with Wilson. According to Sharon, the McBrooms had complete access to their home—they ate and socialized with the Wilsons and showered inside the residence. The only thing that the McBrooms did inside their RV was sleep.

Enola McBroom testified that her husband and Wilson were best friends. Enola said that McBroom and Wilson would take trips together for the stated purpose of either looking for oil rig work or scouting out land in Missouri (Enola said that she and McBroom were planning on moving to Missouri). She said that on March 14, 2008, the men were away on a trip because she remembered calling McBroom on March 14 and telling him that he needed to come home because her father had died. Enola said that the men took off on a second trip sometime in the morning on March 25, 2008. Enola said that the men left in Wilson's car, which she described as a "silverish-bluish colored car." Enola said that the men were gone 3 to 4 days and that she had to go to Missouri to pick them up because Wilson's car broke down.

Enola said that around May 15, 2008, she and McBroom began living in an RV they parked on the Wilson property. Enola said that they slept in the RV but used the Wilsons' home to cook, eat, shower, watch T.V., and socialize with the Wilsons. Enola said that once she and McBroom began living in the RV on the Wilson property, McBroom and Wilson did not take any more trips together.

Carolyn Engler testified for the defense. She lived approximately a mile away from Elinor Clark's residence. Engler said that on March 25, a man came to her front door between 11 a.m. and 12 p.m. Engler described the man as either Hispanic or possibly a dark-skinned white male. On cross-examination, Engler said that the man was 5'7" to 5'8" tall and had a medium build. She also said he was "rough" looking. Engler said that the man asked her for

directions to Alton. Engler believed the man was not paying atten-tion to her when she gave him directions. The man eventually left.

Engler described the man's vehicle as an older, four-door, "kind of blue-gray Cutlass, Bonneville type car." Engler said that she saw another individual in the car, who she described as having dark skin and having thick, dark curly hair that protruded from the bot-tom of a cap he was wearing. Notably, law enforcement showed Engler a photo lineup which included McBroom's photo; she did not pick out McBroom's photo as depicting either man she saw on March 25.

During closing arguments, the prosecutor noted that Jeffrey Benson, the delivery driver for AmeriPride, did not pick Mc-Broom's photo out of the array he was shown. But, the prosecutor argued that Benson's description of the man he saw in the passen-ger seat of the car that passed him on Highway 281 (stringier hair and wearing glasses) "matches the description of the defendant."

The jury found McBroom guilty of first-degree murder based on the combined theories of premeditated murder and felony mur-der. The jury also found McBroom guilty of aggravated burglary of the Scott Noel residence and guilty of burglary of the Clark residence. The district court sentenced McBroom to a hard 20 life sentence for the murder conviction and imposed a consecutive 47-month prison sentence for the remaining convictions. McBroom filed a timely notice of appeal.

## CHANGE OF VENUE

For his first issue on appeal, McBroom argues that the district court erred when it denied his change of venue motion. McBroom claims that a survey of the Osborne County residents prior to trial showed that a pervasive bias against him existed in the community, preventing a fair and impartial trial from taking place in Osborne County. McBroom also claims that comments made during voir dire by nine individuals who served on his jury demonstrated the impossibility of selecting an impartial Osborne County jury.

K.S.A. 22-2616(1) provides that a change of venue motion must be granted "if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the

defendant that he cannot obtain a fair and impartial trial in that county." "The determination of whether to change venue is entrusted to the sound discretion of the trial court, and its decision will not be disturbed on appeal absent a showing of prejudice to the substantial rights of the defendant." *State v. Higgenbotham*, 271 Kan. 582, 591, 23 P.3d 874 (2001). "The burden is on the defendant to show prejudice exists in the community, not as a matter of speculation but as a demonstrable reality. The defendant must show that such prejudice exists in the community that it was reasonably certain he or she could not have obtained a fair trial." 271 Kan. at 591-92.

*Applicable Facts*

Prior to trial, McBroom filed a change venue of motion in which he argued that he could not obtain a fair and impartial trial in Osborne County. A hearing on the motion was conducted where the defense presented the testimony of Thomas Beisecker, a professor in the Department of Communication Studies at the University of Kansas and president of a jury consulting and research firm. Notably, Beisecker previously performed venue studies in *State v. Verge*, 272 Kan. 501, 34 P.3d 449 (2001), and *Higgenbotham*.

Beisecker conducted a survey of 163 Osborne County residents, a number he stated was sufficient to get a reliable survey of opinions in the community. When asked, 87.7 percent of those surveyed recalled reading, seeing, or hearing something about a local farmer being killed in his home. Respondents who answered that they could not recall anything about the murder were given further details about the crimes. After receiving this information, two more respondents said that they recalled the murder, bringing the percentage of respondents recalling something about the murder to 89 percent. Of those people recalling something about the murder, 77.9 percent believed McBroom was either definitely guilty or probably guilty. In total, 69.3 percent of the people surveyed felt that McBroom was probably or definitely guilty of the crimes.

For comparison purposes, Beisecker also conducted a survey of 171 residents in Harper County, a county with similar demograph-

ics. Of those surveyed, 22.8 percent recalled something about the murder and 33 percent of those people who recalled something about the murder believed that McBroom was either definitely guilty or probably guilty.

When asked to compare the media coverage of the Noel murder to other crimes in which he conducted surveys, Beisecker said that the quantity of the media coverage was what he would have anticipated for Osborne County. With regard to the nature of the media coverage, he believed that the coverage "was not very inflammatory at all. It was factually based."

Beisecker opined that based on the survey results and his training, there was a substantial amount of bias against McBroom in Osborne County.

In denying the change of venue motion, the district court stated:

"Where Dr. Beisecker anticipates—he characterizes it as a conclusion—a strong likelihood of prejudice against defendant Delbert McBroom in Osborne County, Kansas, the court believes it is premature to reach such a conclusion. McBroom has shown nothing more than a mere possibility that an opportunity for prejudice exists. That opportunity for prejudice exists in every case and is one of the primary reasons for *voir dire*.

"Defendant's expert Dr. Beisecker possesses enviable credentials, but in order to blindly accept his conclusion, the court must find that Osborne County jurors either cannot or will not follow the court's instructions. Until jurors are asked questions and the court hears responses, Dr. Beisecker's opinions are mere conclusions; those conclusions are speculative and do not rise to a level of demonstrable reality.

"The defendant has not met his burden of proof; defendant's request for a change of venue is denied. The court reserves the right to revisit the venue issue as the interests of justice might require."

Prior to trial, the district court and the parties agreed that voir dire should be conducted in groups of 20 venire members with no more than 20 members in the courtroom at any one time. Voir dire would be conducted until 42 jurors were qualified and passed for cause. The parties would then each exercise 14 peremptory challenges, resulting in 12 jurors and 2 alternates. Two hundred prospective jurors were selected and mailed an extensive jury questionnaire to fill out prior to voir dire. These questionnaires, however, were not included in the record on appeal.

Though the district court allotted 3 days for jury selection, only 1 day was needed to qualify 42 prospective jurors. Notably, counsel, who conducted voir dire, examined only 48 prospective jurors before qualifying and passing for cause 42 individuals. Of the 48 individuals examined, McBroom only moved to strike 8 for cause. The district court granted five of those strikes. Of the three individuals challenged for cause by McBroom and not removed by the district court, none were picked to serve as jury members or alternates. The trial proceeded with 12 jurors and 1 alternate due to a jury member being excused for illness prior to opening statements.

As mentioned above, McBroom points to comments made during voir dire by nine members of the jury as being indicative of community bias against him. As previously mentioned, McBroom did not move to strike any these individuals for cause during voir dire.

R.D. said that her children went to school with Scott Noel's children and that Scott was a customer of the conservation district where she worked. R.D. stated that she did not consider Scott a friend and that there was nothing about their relationship that would make it difficult for her to be a fair and impartial juror. Furthermore, though R.D. admitted to knowing several witnesses in the case, none were friends or family members, and her relationship with these witnesses would not cause her any concern about being fair and impartial. R.D. indicated that despite having some concern regarding the potential reaction friends and family members would have, she would render a not guilty verdict if she believed that was the proper verdict.

C.W. said that she had a purse stolen out of her vehicle 3 years ago. She said, however, that nothing about the incident would make it difficult for her to serve as a juror. She also said that she would not be concerned about what people would think if she thought the proper verdict was not guilty. C.W. indicated that if she was in McBroom's position, she would be comfortable with someone with her mindset serving on the jury.

M.H. stated he was the victim of an armed robbery when he was 18 years old, but stated that the incident "was a long time ago" and would not cause any problems for him serving on the jury. M.H.

stated that he had read headlines regarding the Noel murder but did not actually read any articles and did not follow the case in the news. M.H. said that there was nothing he had heard about the case that would cause him any concern about being a fair and impartial juror. M.H. also indicated that if he was in McBroom's position, he would have no concern with someone with his mindset serving on the jury.

S.B. said that she had high regard for law enforcement and was thankful for their service. But she indicated that she would have no problems or concerns with rendering a not guilty verdict if she concluded that was the proper verdict. Furthermore, she said that if she was in McBroom's position, she would have no concerns with somebody with her mindset serving on the jury. Later during voir dire, S.B. made it known that her husband was also summoned for jury duty and that if both of them were picked to serve on the jury, it would present an extreme hardship for their farm. S.B.'s husband, however, was not selected to serve on the jury.

L.M. stated that Scott's daughter was her eighth-grade softball coach, but nothing about that relationship caused her any concern with serving on the jury. L.M. stated that nothing she had read or heard in the news reports had caused her to make up her mind regarding the murder. She also indicated that she had no concern about community reaction if she thought the proper verdict was not guilty. Furthermore, she indicated that if she was in Mc-Broom's position, she would want a juror with her state of mind.

R.M. indicated that there was nothing she had read or heard about the crimes that would make it difficult for her to be a fair and impartial juror. R.M. said she completed a jury questionnaire for Kenneth Wilson's trial (McBroom's alleged accomplice) but did not participate in voir dire. She said nothing about that experience made it difficult for her to be a fair and impartial juror.

B.P. was an Osborne County commissioner for 8 years and knew several of the witnesses. Despite this, B.P. indicated she would have no problem rendering a not guilty verdict if she concluded that was the correct verdict.

D.C. stated that he had heard very little about the case but acknowledged that everyone in the community had heard something

about the case because, according to him, the "[w]ind blows every day here." D.C. indicated, however, that he had not heard any specific details about the case.

W.M. stated that he had known Scott Noel and had gone hunting with him in the past. But W.M. indicated that they were not close friends and never spent a lot of time socializing with each other. Furthermore, he stated that there was nothing about his relationship with Scott that would prevent him from being a fair and impartial juror.

*Analysis*

In *Higgenbotham*, 271 Kan. at 592, we stated:

"In determining whether the atmosphere is such that a defendant's right to a fair trial would be jeopardized, courts have looked at such factors as the particular degree to which the publicity circulated throughout the community; the degree to which the publicity or that of a like nature circulated to other areas to which venue could be changed; the length of time which elapsed from the dissemination of the publicity to the date of trial; the care exercised and the ease encountered in the selection of the jury; the familiarity with the publicity complained of and its resultant effects, if any, upon the prospective jurors or the trial jurors; the challenges exercised by the defendant in the selection of the jury, both peremptory and for cause; the connection of government officials with the release of the publicity; the severity of the offense charged; and the particular size of the area from which the venire is drawn. [Citation omitted.]"

In making his argument that the district court erred in not granting his change of venue motion, McBroom relies primarily on the survey results showing that a vast majority of the 163 Osborne County residents surveyed were aware that a local farmer had been killed inside his home. As noted above, 69.3 percent of the people surveyed felt that McBroom was probably or definitely guilty of the crime. However, none of the respondents who expressed a belief in McBroom's guilt were asked whether they could set aside this preconceived belief if they were selected as jurors. As the United States Supreme Court has stated:

"It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, *and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case*. This is particularly

true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." (Emphasis added.) *Irvin v. Dowd*, 366 U.S. 717, 722-23, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961).

Consistent with this statement from *Irvin*, we have yet to find that a district court abused its discretion by denying a change of venue motion—supported with survey results similar to those at issue here—when hindsight shows that there were no undue difficulties in empaneling an impartial jury. See *Verge*, 272 Kan. at 505-08 (finding no abuse of discretion even though 96.7 percent of respondents recalled the case and 64 percent believed defendant was either probably or definitely guilty; court stated: "In the past, we have not relied on statistics but, rather, we have focused on the difficulties encountered in impaneling a competent and unbiased jury."); *Higgenbotham*, 271 Kan. at 593-94 (finding no abuse of discretion even though 95.7 percent of respondents recalled the case after being given a brief synopsis and 60.6 percent believed defendant was either probably or definitely guilty; court noted that "neither the defendant nor the State points to any problem with jury selection. That there was little trouble in picking a jury tends to support the trial court's conclusion that no change of venue was necessary."); *State v. Jackson*, 262 Kan. 119, 129-32, 936 P.2d 761 (1997) (finding no abuse of discretion even though 82 percent of the respondents recalled at least some specifics about the incident and more than 60 percent thought the defendant was probably or definitely guilty; court stated: "All the jurors were rigorously questioned during voir dire and stated they could listen to the evidence at trial and reach a verdict with impartiality. After the final panel was selected, the defendant had an opportunity to renew his change of venue but chose not to do so and passed the panel for cause. This indicates during voir dire there were few problems with obtaining and empaneling an impartial jury."); *State v. Swafford*, 257 Kan. 1023, 1035-37, 897 P.2d 1027 (1995) (finding no abuse of discretion even though 57.1 percent of those surveyed felt the

evidence was strong against the defendant; court stated: "The record discloses that the attorneys had few, if any, problems in questioning jury members about the effects of publicity. All but three of the challenges for cause because of pretrial publicity were granted, and the remaining three challenged venirepersons were taken off by peremptory strikes. The whole selection process lasted two days. Although jury selection was drawn out due to the district court's precautions, it was not inordinately difficult to pass a pool of jurors for cause. No objections were made about the process following the selection."); *State v. Anthony*, 257 Kan. 1003, 1013-15, 898 P.2d 1109 (1995) (companion case to *Swafford*, court found no abuse of discretion even though 97.5 percent of those surveyed had heard of the case and 63.8 percent of those surveyed felt the evidence was strong against the defendant; court made same observations regarding voir dire as it did in *Swafford*); see also *State v. Ruebke*, 240 Kan. 493, 500, 731 P.2d 842 (1987) ("The trial court had no difficulty in finding from the jury panel jurors who stated that they could render a fair and impartial verdict. The small number of jurors dismissed by the court for cause and the effort of the judge to press no one into jury service who showed the slightest hint of prejudice established that there was no abuse of discretion in denying a change of venue.").

Courts in other jurisdictions have also relied on the outcome of voir dire for determining whether a trial court erred in denying a defendant's change of venue motion. See, *e.g.*, *McGehee v. State*, 348 Ark. 395, 413-14, 72 S.W.3d 867 (2002) (trial of coperpetrator in same county 4 months earlier did not prejudice defendant and would not have entitled him to a change of venue; voir dire revealed a jury committed to giving defendant fair trial and following court's instructions); *Ward v. State*, 810 N.E.2d 1042, 1049 (Ind. 2004) ("An abuse of discretion does not occur where voir dire reveals that the seated panel was able to set aside preconceived notions of guilt and render a verdict based solely on the evidence."); *State v. Cunningham*, 105 Ohio St. 3d 197, 203, 824 N.E.2d 504 (2004) ("If the record on voir dire establishes that prospective jurors have been exposed to pretrial publicity but would nevertheless determine defendant's guilt or innocence solely on the law and

evidence presented at trial, it is not error for the trial court to empanel those jurors."); *Sheppard v. State*, 357 S.C. 646, 655, 594 S.E.2d 462 (2004) ("When a trial judge bases the denial of a motion for a change of venue because of pretrial publicity upon an adequate voir dire examination of the jurors, his decision will not be disturbed absent extraordinary circumstances.").

McBroom does not identify any difficulties with the jury selection. Voir dire was completed in 1 day, and counsel examined only 48 prospective jurors before qualifying and passing for cause 42 individuals. Of the 48 individuals examined, McBroom only moved to strike 8 for cause, 5 of which were stricken by the district court. Of the three individuals challenged for cause by McBroom and not removed by the district court, none were picked to serve as jury members or alternates. Further, McBroom concedes in his brief that "a successful selection of a jury weighs heavily in determining whether a denial of a change of venue motion should be upheld on appeal."

Finally, none of the statements from the jurors identified in McBroom's brief indicate that they had a bias against McBroom or would act unfairly or impartially in rendering a verdict. In *State v. Hunter*, 241 Kan. 629, 636, 740 P.2d 559 (1987), this court stated:

"When crimes occur in rural areas it is inevitable that members of the jury panel will be acquainted with trial participants or victims. In such cases we must examine the jury selection process to determine whether defendant's rights to a fair trial have been jeopardized. As we have stated, the difficulty in selecting a fair and impartial jury is an important factor in weighing a claim of prejudice. [Citations omitted.] In this case, a jury panel was passed for cause after one and one-half days of voir dire. From a panel of 143 prospective jurors, 39 were excused for cause, 51 were dismissed by peremptory challenges, and 39 were excused from service; twelve jurors and two alternates served. There appears to have been no difficulty in selecting an impartial jury. Although five of the final twelve jurors stated they were acquainted with one or more of the victims, none admitted to a close friendship and each stated under oath that he or she would be able to remain fair and impartial. In order to find that defendant has established prejudice, we would have to assume that these jurors violated their oaths; this we cannot do."

Here, though some of the jurors stated that they were acquainted with the murder victim, his family, or witnesses in the

case, none indicated that these acquaintances would prevent them from being fair and impartial.

We conclude that McBroom has failed to show that there existed so great a prejudice in Osborne County that prevented him from receiving a fair and impartial trial. See K.S.A. 22-2616(1). Thus, it cannot be said that the district court abused its discretion in denying McBroom's motion for a change of venue.

## SUFFICIENCY OF THE EVIDENCE

Next, McBroom contends that the State presented insufficient evidence that he committed any crime. He argues that no direct evidence was presented at his trial to show that he was in or anywhere near Osborne County on March 25, 2008, the date of the alleged crimes. He contends that in order for the jury to have found him guilty of committing the crimes charged, it would have had to improperly infer that he was in the county on March 25 and then, based on that improper inference, infer that he committed the crimes charged.

When the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Frye*, 294 Kan. 364, 374-75, 277 P.3d 1091 (2012). An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *State v. McCaslin*, 291 Kan. 697, Syl. ¶ 8, 245 P.3d 1030 (2011). Furthermore, we have recognized that there is no distinction between direct and circumstantial evidence in terms of probative value. *State v. Evans*, 275 Kan. 95, 105, 62 P.3d 220 (2003). "A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference." *McCaslin*, 291 Kan. 697, Syl. ¶ 9.

In making his argument, McBroom overlooks several key pieces of evidence that could have been relied on by the jury to show that he was in Osborne County on March 25, 2008, and that he committed the crimes charged. First, McBroom told KBI agents that

he and Wilson took a trip to Missouri during the week of March 23. Initially, McBroom said that they left on their trip on March 26 but later said that the departure date was March 25. McBroom said that they returned from this trip on March 29 after Enola came and picked them up in Missouri due to Wilson's car breaking down. Notably, McBroom said that during this trip, he was with Wilson the entire time except for one instance when they were at a lake in Missouri and Wilson went somewhere to purchase propane canisters. His statement regarding the destination for their trip and the date on which they left was contradicted by Sharon Wilson's testimony at trial. She testified that the men left Salina on March 23 or March 24 and that the purpose of the trip was to find employment in western Kansas working in the oil fields.

Admittedly, Enola testified that the men left Salina on March 25 for a trip to Missouri. But, based on (1) Wilson's DNA being found on a cigarette butt lying in the yard of a Clay County, Nebraska, residence that was burglarized on March 24 (and property from this residence was later found in the Wilson residence); and (2) video footage showing Wilson going into a Fairbury, Nebraska, Walmart on March 24 and purchasing three, two-bottle packages of small propane bottles, it is clear that Wilson and, by logical implication, McBroom departed Salina (at the latest) sometime on the morning of March 24 and traveled to Nebraska. Thus, if Wilson was in Nebraska on March 24, then based on Sharon's testimony and McBroom's statements to the KBI, it can be presumed that McBroom was also in Nebraska with Wilson on March 24.

The State presented the following evidence to show that McBroom was in Osborne County on March 25: (1) McBroom's statement that he was with Wilson the entire time during their trip; (2) numerous witnesses testifying that around noon on March 25, they saw a car similar to Wilson's car in the vicinity of the Noel residence; (3) Wilson's DNA being found on a cigarette butt inside the Noel residence on March 25 where Scott was murdered; and (3) property from the Clark residence—burglarized on March 25— was found inside the Wilson residence. Based on this evidence, it can be presumed that Wilson and, by logical implication, Mc-

Broom, left Nebraska and were in Osborne County on March 25, 2008, when all the crimes charged took place.

In addition to the evidence establishing that the Clark residence was burglarized on March 25, the State presented evidence showing that on March 25, Scott Noel was shot in the back of his head at pointblank range with his own shotgun while his hands were tied behind his back. Additionally, Scott's body was found on the kitchen floor, and the Noel residence showed signs of being rummaged through as if someone was looking for things of value to take. All of this evidence would tend to establish that whoever killed Scott did so with premeditation or while committing or attempting to commit an aggravated burglary of the Noel residence. In other words, the killing of Scott constituted either premeditated first-degree murder or felony murder, and the entry into his home by an intruder constituted an aggravated burglary. See K.S.A. 21-3401 (first-degree murder); K.S.A. 21-3716 (aggravated burglary); *State v. Gunby*, 282 Kan. 39, Syl. ¶ 9, 144 P.3d 647 (2006) ("Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct, but it does not have to be present before a fight, quarrel, or struggle begins."); *State v. Sanchez-Cazares*, 276 Kan. 451, 458-59, 78 P.3d 55 (2003) ("While premeditation may be established by circumstantial evidence, it may not be inferred merely by the use of a deadly weapon alone.").

Circumstantial evidence not only placed McBroom and Wilson in Osborne County on March 25 but also identified them as the perpetrators of the crimes committed on that day.

- The dates of McBroom and Wilson's trips—March 10-14 and March 24-29—corresponded to when burglaries occurred (1) in Gove County on March 12; (2) in Beeler on March 12; in Bazine on March 13; (3) in Gosper County, Nebraska, on March 14; (4) in Clay County, Nebraska, on March 24; and, (5) in Osborne County on March 25.
- With the exception of the March 13 burglary in Bazine and the March 25 Scott Noel murder/burglary, property taken in each burglary was later found in the Wilson residence. Property taken in the March 12 Gove County burglary—in addition to being found in the Wilson residence—was also found in

McBroom's RV. McBroom was convicted of this burglary prior to trial.

- Among the property taken in the March 12 Gove County burglary was a pillowcase—presumably for the purpose of carrying away the stolen items. Pillowcases were also taken in (1) the March 12 burglary in Beeler; (2) the March 14 Gosper County, Nebraska, burglary; (3) the March 24 Livgren burglary in Clay County, Nebraska, and (4) the March 25 Clark burglary in Osborne County.
- Evidence presented at trial showed that Wilson and McBroom were smokers. Evidence of smoking was found at (1) the March 12 Beeler burglary; (2) the March 13 Bazine burglary; (3) the March 14 Gosper County, Nebraska, burglary; (4) the March 24 burglaries occurring in Clay County, Nebraska; and (5) the March 25 burglaries occurring in Osborne County.
- In the March 12 burglary in Beeler, the evidence showed that the homeowner's .270 caliber rifle was removed from his closet, loaded, and laid on top of a deep freeze. Similarly, Scott's 12-gauge shotgun was removed from a cabinet and loaded. But, unlike the homeowner in Beeler, Scott had the misfortune of returning home during the burglary and was shot with his own gun.
- Matthew Andrews testified that his rural residence north of Elwood, Nebraska, (in Gosper County) was burglarized sometime between the morning and early afternoon of March 14, 2008. When Andrews returned home sometime between 2 p.m. and 3 p.m., he noticed the smell of cigarettes. No one living in the Andrews home smoked. Among the items taken from the Andrews residence were a pillowcase and $7,000 to $8,000 in cash. Items taken from the home were later found in the Wilson residence.
- All of the burglaries occurred during the day at rural residences.

This evidence identifies McBroom and Wilson as the persons responsible for the burglaries occurring prior to the March 25 Osborne County burglaries. Because the prior burglaries were com-

mitted in a manner similar to how the burglaries were committed in Osborne County, one could reasonably determine that Mc-Broom and Wilson were the perpetrators of all the burglaries.

It is also significant to our consideration of the sufficiency of the evidence that the jury heard from Agent Schneider that McBroom gave *six* different inconsistent statements about his and Wilson's travels around March 12-14 and March 25. Initially regarding March 12-14, at various points, McBroom said he had never looked for work in the geographic area of the state where the burglaries occurred, that he was in the general vicinity of the burglaries but not during the time of the burglaries, that he was traveling to Las Vegas during the time of the burglaries, and that he was in Missouri during the burglaries.

But other evidence indicated McBroom fabricated his stories that he and Wilson were in Las Vegas and Missouri. For instance, McBroom said on the way to Las Vegas, he and McBroom were in a car accident they reported to insurance, but law enforcement learned that accident occurred on April 5, not in March. Further, McBroom said when he was in Missouri, he collected newspapers. Unbeknownst to McBroom, however, law enforcement had already pulled his trash and did in fact find newspapers from Missouri, but they were dated late February, not mid-March.

Moreover, McBroom initially told law enforcement he could not remember his whereabouts on March 24 and 25, but he claimed he knew he was not in the county where Scott was murdered. Later, he told law enforcement he and Wilson left for Missouri the day after Scott's murder. Later still, he said that after speaking with Enola, he recalled that they left on the day of the murder. Finally, when confronted with video evidence that Wilson was in Nebraska on March 24, McBroom said he had never been to Nebraska.

Unquestionably, McBroom's vastly inconsistent statements as to his whereabouts during the time periods relevant to. the charges were crucial to the jury's weighing of the evidence. And Mc-Broom's lack of credibility could certainly cause a reasonable jury to conclude McBroom lied to law enforcement about his and Wilson's whereabouts during the dates at issue in order to cover up their involvement with the crimes committed in Osborne County

on March 25. Accordingly, viewing the evidence in a light most favorable to the State, we conclude a rational factfinder could have found McBroom guilty of the crimes charged beyond a reasonable doubt.

### Cumulative Error

Finally, McBroom asserts that even if the above issues do not rise to the level of reversible error, the cumulative effect of these errors operated to deny him a fair trial, requiring a reversal of his convictions.

Cumulative trial errors, when considered collectively, may require reversal of the defendant's convictions when the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. *Thompson v. State*, 293 Kan. 704, 721, 270 P.3d 1089 (2011). "Cumulative error," however, "will not be found when the record fails to support the errors raised on appeal by the defendant." *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009).

Based on the analysis above, McBroom failed to raise a single issue resulting in a showing of error. Accordingly, his cumulative error argument must fail.

Affirmed.

\* \* \*

JOHNSON, J., dissenting: I respectfully dissent from the majority's determination that the State presented sufficient relevant evidence from which a rational, unbiased jury could have found, beyond a reasonable doubt, that Delbert McBroom committed the March 25, 2008, crimes with which he was charged in Osborne County, Kansas. To the contrary, the State left the jury to guess whether McBroom might have been involved, principally relying on guilt-by-association with the previously convicted killer, Kenneth Wilson. Moreover, I believe that the State's ability to obtain the convictions upon legally insufficient evidence was facilitated by conducting the trial in a county where a survey revealed that, before the State presented its first piece of evidence at McBroom's

trial, over two-thirds of the population (69.3%) believed that McBroom was probably or definitely guilty.

I do not quibble with the majority's statement that a conviction can be based upon circumstantial evidence and the reasonable inferences that may fairly be deduced therefrom. But it is equally true that " 'inferences may be drawn only from facts established,' " and inferences may not rest upon another inference. *State v. Williams*, 229 Kan. 646, 649, 630 P.2d 694 (1981) (quoting *State v. Gobin*, 216 Kan. 278, 280, 531 P.2d 16 [1975]). Or, stated another way, " 'where reliance is placed upon circumstantial evidence, the circumstances in question must themselves be proved and cannot be inferred or presumed from other circumstances.' " 229 Kan. at 649 (quoting 1 Wharton's Criminal Evidence § 91, pp. 150-51 [13th ed. 1972]). Here, the critical circumstance that McBroom was at the scene of the crime on March 25, 2008, must be inferred or presumed from other circumstances.

The majority exemplifies the prohibited inference stacking when it describes how the evidence proved McBroom was in Osborne County on the crime date. The majority starts McBroom's speculative journey to Osborne County, Kansas, by pointing to the testimony of his wife, Enola, stating that he and Wilson left Salina on March 25 for a trip to Missouri. The majority then notes two proven circumstances: (1) A cigarette butt with Wilson's DNA was found in the yard of a Clay County, Nebraska, residence that was burglarized on March 24, and stolen property from that residence was later discovered in Wilson's residence; and (2) a surveillance videotape placed Wilson at a Wal-Mart in Fairbury, Nebraska, on March 24. From those circumstances, the majority infers that Enola's testimony was partially false and that Wilson actually left Salina for a trip to Nebraska (not Missouri) on the morning of March 24 (not March 25). Then, the majority presumes that Enola and McBroom were being truthful about the two men embarking on a trip together, albeit on a different day to a different destination. From that inference, the majority presumes that McBroom was in Nebraska with Wilson on March 24 and that the two continued the trip the next day, traveling to Osborne County, Kansas.

The majority's liberal use of the phrase, "it can be presumed," is certainly consistent with the Black's Law Dictionary definition of "presume": "To assume beforehand; to suppose to be true in the absence of proof." Black's Law Dictionary 1223 (8th ed. 2004). The majority's scenario is pure supposition, devoid of proof.

For instance, the proved circumstance that Wilson was present in Clay County and Fairbury, Nebraska, on March 24 could just as naturally lead one to infer or presume that Wilson made a day trip by himself the relatively short distance north from Salina, returning in plenty of time to embark on a Missouri trip with McBroom the following day, as Enola testified. Moreover, the Osborne County circumstances upon which the majority relies—a vehicle vaguely resembling Wilson's was spotted near the decedent's house, a cigarette butt with Wilson's DNA was found at decedent's house, and property from another Osborne County burglary was found at Wilson's residence—can only support a reasonable inference that Wilson was at the crime scene. To implicate McBroom, one must presume the circumstance of his presence at the crime scene based upon stacked inferences, e.g., McBroom was in Osborne County because he and Wilson are always together and McBroom participated in the burglary because he and Wilson always committed burglaries together.

Additionally, when assessing the reasonableness of the majority's presumptions and inferences, one should not ignore the eyewitness testimony describing the vehicle leaving the crime scene as having but one occupant. Granted, a delivery driver testified that he saw a passenger in a car on the highway in the general area of the Osborne County crimes that may have generally matched the description of McBroom, although he failed to positively identify McBroom as that passenger. But that evidence further illustrates inference stacking. First, one has to infer that the observed vehicle belonged to Wilson, then infer that Wilson's car was coming from the crime scene, then infer that the passenger was McBroom, and then presume that Wilson did not pick up McBroom between the crime scene and the highway where it was seen by the delivery driver.

"Under our theory of criminal jurisprudence in this nation, the defendant is clothed with a presumption of innocence until he is proven to be guilty beyond a reasonable doubt by the State." *Williams*, 229 Kan. at 663-64. It is not enough for the State to simply suggest a scenario by which the defendant *could* be guilty. *Cf. State v. Spear*, 297 Kan. 780, 791, 304 P.3d 1246 (2013) (quoting *United States v. Spirk*, 503 F.3d 619, 623 [7th Cir. 2007]) (acknowledging that "many courts have observed that '[a] guess is not proof beyond a reasonable doubt' "). Here, the State's case was more guess than proof.