No. 90,198

STATE OF KANSAS, *Appellee*, v. JONATHAN D. CARR, *Appellant*.

(529 P.3d 1195)

342

346

348

350

Opinion filed July 25, 2014.

*Sarah Ellen Johnson*, of Capital Appellate Defender Office, argued the cause, and *Rebecca E. Woodman* and *Meryl Carver-Allmond*, of the same office, were with her on the briefs for appellant.

*David Lowden*, chief assistant district attorney, argued the cause, and *Debra S. Peterson*, special prosecutor, *Lesley A. Isherwood*, assistant district attorney, *Nola Tedesco Foulston*, former district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

*Per Curiam*: Defendant Jonathan D. Carr, and his brother, Reginald Dexter Carr, Jr., were jointly charged, tried, convicted, and sentenced for crimes committed in a series of incidents in December 2000 in Wichita. This is J. Carr's direct appeal from his 43 convictions and four death sentences.

Our opinion in codefendant R. Carr's direct appeal also is filed today. *State v. Carr*, 299 Kan. 1, 331 P.3d 544. With the exception of the brief introduction to follow, this opinion will refer to the opinion in R. Carr's appeal as much as possible, rather than repeat facts, procedural history, or legal discussions and resolutions.

The first incident giving rise to the charges in this case occurred on December 7 and 8. Andrew Schreiber was the victim. The State charged J. Carr and R. Carr with one count of kidnapping, one count of aggravated robbery, one count of aggravated battery, and one count of criminal damage to property. The jury acquitted J. Carr on all counts and convicted R. Carr on all counts.

In the second incident on December 11, Linda Ann Walenta was the victim. The State charged J. Carr and R. Carr with one count of first-degree felony murder. The jury convicted both men.

In the third incident on December 14 and 15, Heather M., Aaron S., Brad H., Jason B., and Holly G. were the victims of an invasion at the men's Birchwood Drive home that led to sex crimes, kidnappings, robberies, and, eventually, murder and attempted murder. The State charged J. Carr and R. Carr with eight alternative counts of capital murder, four based on a related sex crime under K.S.A. 21-3439(a)(4) and four based on multiple first-degree premeditated murders under K.S.A. 21-3439(a)(6); one count of attempted first-degree murder; five counts of aggravated kidnap-

ping; nine counts of aggravated robbery, eight of which were alternatives, four based on use of a dangerous weapon and four based on infliction of bodily harm; one count of aggravated burglary; 13 counts of rape, eight of which were based on coerced victim-on-victim sexual intercourse and one of which was based on a victim's coerced self-penetration; three counts of aggravated criminal sodomy, two of which were based on coerced victim-on-victim oral sex; seven counts of attempted rape, six of which were based on coerced victim-on-victim overt acts toward the perpetration of rape; one count of burglary; and one count of theft. The State also charged J. Carr and R. Carr with one count of cruelty to animals because of the killing of Holly G.'s dog. The jury convicted J. Carr and R. Carr on all of the charges arising out of the Birchwood incident.

In connection with the three incidents, the State also charged R. Carr alone with three counts of unlawful possession of a firearm. The jury convicted him on these three counts as well.

After J. Carr's acquittal on the Schreiber incident and the defendants' convictions on all other charges, in a separate capital penalty proceeding, J. Carr and R. Carr were sentenced to death for each of the four capital murders committed on December 15. They each received a hard 20 life sentence for the Walenta felony murder. J. Carr received a controlling total of 492 months' imprisonment consecutive to the hard 20 life sentence, and R. Carr received a controlling total of 570 months' imprisonment consecutive to the hard 20 life sentence for the remaining non-death-eligible convictions.

In his briefs, J. Carr raises 21 issues tied to the guilt phase of his prosecution and 16 issues tied to the death penalty phase of his prosecution. In addition, because this is a death penalty case, this court is empowered to notice and discuss unassigned potential errors under K.S.A. 2013 Supp. 21-6619(b), which we do. J. Carr does not challenge the sentences he received for the Walenta felony murder; for the crimes in which Heather M., Aaron S., Brad H., Jason B., and Holly G. were the victims that were not eligible for the death penalty; or for the cruelty to animals conviction.

Both sides sought many extensions of time to file briefs in this appeal and in R. Carr's separate appeal. In J. Carr's case, all of these extension requests were unopposed by the other side of the case. After completion of briefing, this court heard oral argument on December 17, 2013.

After searching review of the record, careful examination of the parties' arguments, extensive independent legal research, and lengthy deliberations, we affirm 25 of J. Carr's 43 convictions, including those for one count of capital murder of Heather M., Aaron S., Brad H., and Jason B. under K.S.A. 21-3439(a)(6) and for the felony murder of Walenta. We reverse the three remaining convictions for capital murder because of charging and multiplicity errors. We also reverse his convictions on Counts 25, 26, 29 through 40, and 42 for coerced sex acts for similar reasons. We affirm the convictions based on Counts 2, 9 through 24, 27, 28, 41, and 43 through 55.

We vacate J. Carr's death sentence for the remaining capital murder conviction, because the district judge refused to sever the defendants' penalty phase trials. We remand to the district court for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND FOR GUILT PHASE ISSUES

The general factual and procedural background for the guilt phase issues in this case is set out in full in the R. Carr opinion. We need not repeat it or supplement it here. To the extent additional, issue-specific factual or procedural background is necessary to resolve any legal issue unique to J. Carr, it will be included in the discussion sections below.

### GUILT PHASE ISSUES AND SHORT ANSWERS

We begin our discussion by setting out the questions we answer today on the guilt phase of J. Carr's trial. We have taken the liberty of reformulating certain questions to focus on their legally significant aspects or effects. We also have reordered questions raised by the defense and have inserted among them unassigned potential errors noted by us, because we believe this organization enhances

clarity. We number the questions disposed of by our opinion in R. Carr's appeal 1 through 21, despite occasional intervening sub-headings. We do not repeat our full discussion of these questions in this opinion; rather, we include only their short answers and references to the appropriate sections of the R. Carr opinion that control the resolution of the similar issues raised or noticed in this appeal. We number the four additional questions not disposed of by our opinion in R. Carr's appeal J1 through J4. Our short answer to each question follows the question. We then discuss these four questions fully in individual sections of this opinion.

*Issues Disposed of by Opinion in R. Carr Appeal*

*Issues Affecting All Incidents*

1. Did the district judge err in refusing to grant defense motions for change of venue? A majority of six of the court's members answers this question no for reasons explained in Section 1 of the R. Carr opinion, while one member of the court dissents and writes separately on this issue and its reversibility, standing alone.

2. Did the district judge err in refusing to sever the guilt phase of defendants' trial? A majority of six members of the court answers this question yes for reasons explained in Section 2 of the R. Carr opinion, while one member of the court dissents and writes separately on this issue. A majority of four members of the court agrees that any error on this issue was not reversible standing alone for reasons explained in the R. Carr appeal, while three members of the court dissent, and one of them writes separately for the three on the reversibility question.

3. Was it error for the State to pursue conviction of J. Carr for all counts arising out of the three December 2000 incidents in one prosecution? The court unanimously answers this question no for reasons explained in Section 3 of the R. Carr opinion.

4. Did the district judge err (a) by excusing prospective juror M.W., who opposed the death penalty, for cause, (b) by failing to excuse allegedly mitigation-impaired jury panel members W.B., D.R., D.Ge., and H.Gu. for cause, or (c) by excusing prospective jurors K.J., M.G., H.D., C.R., D.H., and M.B., who expressed moral or religious reservations about the death penalty, for cause?

The court unanimously agrees there was no error on any of these bases for reasons explained in Section 4 of the R. Carr opinion.

5. Did the district judge err by rejecting a defense challenge under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct 1712, 90 L. Ed. 2d 69 (1986), to the State's peremptory strike of juror and eventual foreperson W.B.? The court unanimously answers this question yes for reasons explained in Section 5 of the R. Carr opinion. A majority of four members of the court agrees that any error on this issue was not reversible standing alone for reasons explained in Section 5 of the R. Carr opinion, while three members of the court dissent, and one of them writes separately for the three on the reversibility question.

### Issue Specific to Walenta Incident

6. Was the district judge's admission of statements by Walenta through law enforcement error under the Sixth Amendment and *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)? The court unanimously answers this question yes for reasons explained in Section 6 of the R. Carr opinion, but the court also unanimously agrees that this error was not reversible standing alone.

### Issues Specific to Quadruple Homicide and Other Birchwood Crimes

7. Did faulty jury instructions on all four K.S.A. 21-3439(a)(4) sex-crime-based capital murders and a multiplicity problem on three of four K.S.A. 21-3439(a)(6) multiple-death capital murders combine to require reversal of three of J. Carr's death-eligible convictions? The court unanimously answers this question yes for reasons explained in Section 9 of the R. Carr opinion.

8. Was a special unanimity instruction required for Counts 1, 3, 5, and 7 because of multiple sex crimes underlying each count? The court declines to reach the merits of this issue for reasons explained in Section 10 of the R. Carr opinion.

9. Must sex crime convictions underlying capital murder Counts 1, 3, 5, and 7 be reversed because they were lesser included offenses of capital murder under K.S.A. 21-3439 (a)(4)? The court

declines to reach the merits of this issue for reasons explained in Section 11 of the R. Carr opinion.

10. Was the State's evidence of aggravated burglary sufficient? The court unanimously answers this question yes for reasons explained in Section 12 of the R. Carr opinion.

11. Did the State fail to correctly charge and the district judge fail to correctly instruct on coerced victim-on-victim rape and attempted rape, as those crimes are defined by Kansas statutes, rendering J. Carr's convictions on those offenses void for lack of subject matter jurisdiction? The court unanimously answers this question yes for reasons explained in Section 13 of the R. Carr opinion.

12. Was the State's evidence of J. Carr's guilt as a principal on Count 41 for Holly G.'s digital self-penetration sufficient? A majority of four of the court's members answers this question yes for reasons explained in Section 14 of the R. Carr opinion, while three members of the court dissent, and one of them writes separately for the two of them on this issue and its reversibility.

13. Were Count 41 and Count 42 multiplicitous? The court unanimously answers this question yes and reverses J. Carr's conviction as a principal on Count 42 for reasons explained in Section 15 of the R. Carr opinion.

14. Was evidence of results from mitochondrial DNA testing of hairs found at the Birchwood home erroneously admitted? The court unanimously answers this question no for reasons explained in Section 19 of the R. Carr opinion.

15. Did the district judge err by failing to instruct on felony murder as a lesser included crime of capital murder? The court unanimously answers this question no for reasons explained in Section 21 of the R. Carr opinion.

*Other Evidentiary Issues*

16. Did the district judge err by automatically excluding eyewitness identification expert testimony proffered by the defense? The court unanimously answers this question yes for reasons explained in Section 22 of the R. Carr opinion, but the court also unanimously agrees that any error on this issue was not reversible standing alone.

17. Did the district judge err by permitting a jury view of locations referenced in evidence, in violation of the defendants' right to be present, right to assistance of counsel, and right to a public trial? The court unanimously answers this question no for reasons explained in Section 23 of the R. Carr opinion.

*Other Instructional Issues*

18. Did the district judge err by failing to include language in the instruction on reliability of eyewitness identifications to·ensure that jurors considered possible infirmities in cross-racial identifications? The court unanimously answers this question no for reasons explained in Section 24 of the R. Carr opinion.

19. Was the instruction on aiding and abetting erroneous because (a) it permitted jurors to convict the defendants as aiders and abettors for reasonably foreseeable crimes of the other, regardless of whether the State proved the aider and abettor's premeditation, (b) it failed to communicate that the defendant aider and abettor had to possess the premeditated intent to kill in order to be convicted of capital murder, or (c) it omitted language from K.S.A. 21-3205(2)? The court unanimously answers the first question yes for reasons explained in Section 25 of the R. Carr opinion. The court unanimously answers the second question no for reasons explained in Section 25 of the R. Carr opinion. The court unanimously answers the third question no for reasons explained in Section 25 of the R. Carr opinion. The court unanimously agrees that the error on the first question was not reversible standing alone for reasons explained in Section 25 of the R. Carr opinion.

*Prosecutorial Misconduct*

20. Did one of the prosecutors commit reversible misconduct by telling jurors to place themselves in the position of the victims? The court unanimously answers this question no for reasons explained in Section 26 of the R. Carr opinion.

*Cumulative Error*

21. Did cumulative error deny J. Carr a fair trial on his guilt? A majority of four of the court's members answers this question no for reasons explained in Section 27 of the R. Carr opinion, while

three members of the court dissent, and one of them writes separately for them on this issue.

*Issues Not Disposed of by Opinion in R. Carr Appeal*

J1. Did the district judge err by refusing to grant a mistrial when the opening statement by R. Carr's counsel implicated J. Carr and another unknown man as the perpetrators of the Birchwood crimes? A majority of four of the court's members answers this question no. Three members of the court would hold this to be error and include it among those considered under the cumulative error doctrine.

J2. Did admission of Walenta's statements violate J. Carr's confrontation rights under Section 10 of the Kansas Constitution Bill of Rights? The court declines to reach the merits of the Section 10 argument.

J3. Did J. Carr's conviction on the Walenta felony murder depend upon impermissible inference stacking, meaning the State's evidence was insufficient? A majority of six members of the court answers this question no. One member of the court dissents and writes separately on this issue and its reversibility, standing alone.

J4. Was the State's evidence of J. Carr's guilt as an aider and abettor of R. Carr's rape and aggravated criminal sodomy of Holly G. sufficient? The court unanimously answers this question yes.

## J1. REFUSAL TO GRANT MISTRIAL AFTER OPENING STATEMENTS

This court rules today in the R. Carr appeal that District Judge Paul Clark erred by refusing to sever the defendants' guilt phase trials but that the error does not require reversal standing alone. See *State v. Carr*, 299 Kan. at 281-82. These holdings apply equally to this appeal on behalf of J. Carr.

J. Carr has argued additional reasons peculiar to him why severance was required—that a joint trial limited his ability to introduce certain hearsay testimony through Tronda Adams, that it allowed R. Carr to act as a second prosecutor by introducing testimony from Stephanie Donley and a statement from Holly G. that were inculpatory of J. Carr, and that it permitted the jury to observe and be prejudiced by R. Carr's improper courtroom be-

havior. But these reasons, if meritorious, would only add weight to our holding that the failure to sever was error. They would not persuade us that reversal of all of J. Carr's convictions is required as a result of that error.

We mention the severance issue in this context because it is distinct from but related to the unique challenge J. Carr makes on this appeal to Judge Clark's refusal to grant him a mistrial after opening statements.

R. Carr's counsel told the jury during opening statement that his client merely stored property stolen from the Birchwood victims for J. Carr and another unknown, uncharged third man, suggesting that J. Carr and the third man were responsible for all of the charged Birchwood crimes. These remarks prompted an objection from counsel for J. Carr on the grounds that they were argumentative and unsupported by the evidence. Judge Clark overruled the objection.

This ruling by Judge Clark was correct. Counsel for R. Carr began his explanation of what happened on the night of December 14 and 15, 2000, with the phrase "the evidence will show." That phrase signals the purpose of opening statement; it provides an opportunity for counsel to outline a version of events that he or she expects the evidence to prove to the jury. *State v. Kleypas*, 272 Kan. 894, Syl. ¶ 23, 40 P.3d 139 (2001) (purpose of opening statement to assist jury in understanding expected evidence; attorneys given reasonable latitude to state facts expected to be proved). In addition, the objection by J. Carr's counsel that the opening statement was unsupported by evidence was virtually impossible to sustain at that stage of the case, when all evidence was yet to be admitted.

R. Carr's counsel continued to discuss the involvement of J. Carr and the third unknown man in the Birchwood crimes, finally observing that "the Birchwood address is replete with Jonathan Carr's DNA . . . . Ultimately, the DNA evidence will show that Jonathan Carr, not Reginald Carr, Jonathan Carr committed most, if not all of the crimes which are alleged in the complaint and that he did it with a third black male who still walks the streets of Wichita."

At this point the State objected, and Judge Clark sustained the objection, saying, "It's an improper comment."

During that day's lunch break, outside the presence of the jury, the State argued that the opening statement by counsel for R. Carr had violated rulings on motions in limine and that he should be sanctioned for misconduct. The prosecutor also asked the judge to instruct the jury to disregard the statement. J. Carr moved for a mistrial. The grounds his counsel advanced in support of the motion, although abbreviated, were exactly the same as those advanced in support of J. Carr's multiple motions for severance: The defenses of J. Carr and R. Carr were mutually and irreconcilably antagonistic.

When examining an appellate claim arising out of denial of a mistrial, we review the district judge's decision for an abuse of discretion. *State v. Waller*, No. 106,102, 299 Kan. 707, 722, 328 P.3d 1111 (2014). " '[T]he party alleging the abuse bears the burden of proving that his or her substantial rights to a fair trial were prejudiced.' *State v. Angelo*, 287 Kan. 262, 283, Syl. ¶ 16, 197 P.3d 337 (2008) (citing *State v. White*, 284 Kan. 333, 161 P.3d 208 [2007])." *State v. Leaper*, 291 Kan. 89, 96-97, 238 P.3d 266 (2010). We first ask whether the district judge abused his or her discretion when deciding whether there was a fundamental failure in the proceedings. If so, we then examine whether the district judge abused his or her discretion when deciding whether the problematic conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice. *State v. Harris*, 293 Kan. 798, 814-15, 269 P.3d 820 (2012).

Having already held that defense motions for severance of the guilt phase should have been granted, we also hold that Judge Clark abused his discretion by failing to recognize a fundamental failure in the proceedings when R. Carr's counsel made his remarks during opening statement. Those remarks made the irreconcilable antagonism of the codefendants' cases inescapably clear. However, also in line with the majority view on severance, we further hold that there was no abuse of discretion in refusing to grant a mistrial to cure that failure.

At the time R. Carr's counsel wrapped up his opening statement, the jury was immediately told that his remarks were "improper." No evidence to support the third-party theory of the case was ever introduced. And, ultimately, the jury received the usual instruction that statements of counsel are not evidence. Under these circumstances, we do not discern enough additional damage to J. Carr's case attributable to the opening statement by R. Carr's counsel— *i.e.*, any damage beyond that J. Carr's case already was bound to suffer because of the denial of severance—to persuade us that all of his convictions must be reversed.

### J2. CONFRONTATION RIGHTS UNDER SECTION 10 OF KANSAS CONSTITUTION BILL OF RIGHTS

Like R. Carr, J. Carr challenges the admission of Walenta's statements under the Sixth Amendment and the Confrontation Clause. We have fully discussed those arguments in Section 6 of the R. Carr opinion and need not revisit them here. J. Carr also invoked Section 10 of the Kansas Constitution Bill of Rights in support of his position on this issue, and it is that invocation that prompts us to make a brief response in this opinion.

We have not previously differentiated the rights of a defendant protected by the Sixth Amendment and those protected by Section 10. See *State v. Brown*, 285 Kan. 261, 282, 173 P.3d 612 (2007). And we need not do so here. We leave the merits of any argument under Section 10 to the next case.

### J3. SUFFICIENCY OF EVIDENCE ON WALENTA FELONY MURDER

J. Carr challenges the evidence supporting his conviction of Walenta's felony murder as insufficient, arguing that impermissible inference stacking was required in order for the jury to convict.

*Additional Factual and Procedural Background*

Count 51 in the amended complaint charged both defendants with first-degree felony murder of Walenta while committing or attempting to commit the inherently dangerous felony of aggravated robbery.

Summarized for ease of reference, the evidence showed Walenta was approached by a black male shortly after she pulled into her

driveway about 9:40 p.m. on the evening of December 11, 2000. Walenta saw the man get out of a light-colored four-door car that had followed her and then parked near her house. The man indicated in some way that he needed assistance, and Walenta rolled down her driver's-side window a few inches to talk to him. As soon as she did so, the man stuck a black handgun into the car, holding it palm down and pointing it at her head. When she attempted to put her Yukon in reverse to get away, the man shot her three times. He then ran away and the light-colored car pulled away. Walenta said she was not sure whether the gunman had been left behind by whoever was driving the light-colored car.

Later on the evening of December 11, about 11:15, J. Carr showed up at Adams' house. Adams testified in pertinent part:

"Q. Do you remember what he was driving?

"A. I think he was dropped off that night and his brother came back to pick him up.

"Q. And so you are not sure of the vehicle?

"A. The Camry, it would have been the [light-colored four-door] Camry.

"Q. Okay. So when his brother returned, did you see him to the door?

"A. No, I don't think so.

"Q. Do you recall whether you saw the Camry the early morning hours of the 12th?

"A. No, I don't, no."

Adams also testified that J. Carr had a black handgun with him on the same night, which he left with her. Late the next day he asked her to return the gun to him, scolded her for touching it too much, and then proceeded to clean it and every bullet in it thoroughly. Adams identified the black Lorcin at trial as the gun J. Carr had with him on the night of December 11, 2000.

A few days later, after J. Carr and R. Carr had been arrested in the wake of the Birchwood crimes, Walenta picked two pictures out of a photo array as representative of the general appearance of the man who had shot her. One of those pictures was of R. Carr. She also said that the eyes of the man in the photo of R. Carr represented what she remembered of the gunman's eyes. She did

not see anyone else at the scene of the shooting and was not able to pick any photo from an array containing a photo of J. Carr.

Ballistics expert testimony established that the black handgun used in the shooting of Walenta was the same black Lorcin .380 used to shoot out Schreiber's tire and to murder the four friends from the Birchwood home.

J. Carr was acquitted on the four charges arising out of the Schreiber incident and convicted on all charges against him arising out of the Walenta and Birchwood incidents.

*Evidence Sufficiency*

Our standard of review on sufficiency claims is often stated and familiar:

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, examined in the light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. [Citations omitted.] While the State must sustain its burden of proof on each element of an offense charged, circumstantial evidence and the logical inferences therefrom are sufficient to support a conviction of even the most serious crime. [Citations omitted.] If an appellate court holds that evidence to support a conviction is insufficient as a matter of law, the conviction must be reversed; and no retrial on the same crime is possible. See *Burks v. United States,* 437 U.S. 1, 11, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978) (double jeopardy precludes second trial once appellate court reverses for insufficient evidence); *State v. Houck,* 240 Kan. 130, 135-36, 727 P.2d 460 (1986) (conviction reversed without remand, where evidence did not support conviction of offense charged)." *State v. Scott,* 285 Kan. 366, 372, 171 P.3d 639 (2007).

In addition, appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. McCaslin,* 291 Kan. 697, 710, 245 P.3d 1030 (2011).

We do not agree with J. Carr that his conviction of Walenta's felony murder required inference to be stacked upon inference.

Walenta saw the gunman emerge from the passenger seat of the light-colored car, and she saw the car pull away from its parking place immediately after the shooting. A juror need only make one inference from these facts to arrive at a finding that there was another person driving the car that followed her. Adams testified that J. Carr was with his brother on the night of the crime. Adams'

testimony on whether she ever saw J. Carr in the company of R. Carr on the night of December 11 is ambiguous; she may have seen them together, but she may not have. Regardless, she had many ways of knowing they had been together. Her testimony on that point was not ambiguous or unclear, and it placed J. Carr with R. Carr not long after Walenta was shot. This testimony did not require the jury to draw an inference at all. Adams' testimony on the car J. Carr and R. Carr would have been using was equally clear. The phrasing of the questions put to her gave her every opportunity to say that she was unsure; she did not. This testimony, again, did not require any inference to be stacked on any other inference. Finally, J. Carr's possession of the black gun later identified as the Walenta murder weapon also was clear. He had it in his possession on December 11, 90 minutes after Walenta's shooting; he gave it to Adams; he took it back from her on December 12; he was unhappy that she had been handling it, and he cleaned it and the bullets it held—remarkably thoroughly. These were direct observations of Adams. No inference of any kind was required.

What was required was the jury's willingness to be persuaded of J. Carr's guilt on circumstantial evidence. This is expressly allowed under Kansas law. See *State v. Lowrance*, 298 Kan. 274, Syl. ¶15, 312 P.3d 328 (2013) (even most serious of crimes may be proved by circumstantial evidence). Circumstantial proof is still proof. It is not equivalent to impermissible inference-stacking. It can rise to the level of beyond a reasonable doubt.

Particularly when we view the evidence in the light most favorable to the prosecution, we conclude the evidence in this case was sufficient to convict J. Carr of Walenta's murder. This conclusion is reinforced by our recent decision in *State v. McBroom*, 299 Kan. 731, 756-58, 325 P.3d 1174 (2014), in which we held that evidence of the defendant's participation in a string of burglaries with a friend could be relied upon by a jury to find he also participated in a burglary/homicide that was apparently committed by more than one person in the same general area and time frame. In this case, the evidence against J. Carr on the Birchwood incident would naturally have reinforced the evidence on the Walenta incident.

## J4. Accomplice Culpability for Codefendant's Sex Crimes

J. Carr also challenges his conviction as an aider and abettor of R. Carr's rape and aggravated criminal sodomy of Holly G.

We fully discussed the mirror image of this challenge in our opinion on the R. Carr appeal, in Section 16. There we ruled that R. Carr could be found guilty as an aider and abettor of J. Carr's sex crimes against Holly G. and Heather M., even though R. Carr was out of the Birchwood home on a trip with a victim to one or more ATMs or in another room when the crimes occurred. The all-night joint enterprise of the Birchwood intruders was plainly and repeatedly demonstrated by the State's evidence, particularly Holly G.'s lengthy and detailed testimony. Under the standard of review recited in the previous section of this opinion, we have no hesitation in holding that the evidence J. Carr aided and abetted R. Carr's rape and aggravated criminal sodomy of Holly G. was sufficient. See *State v. Pratt*, 255 Kan. 767, 773, 876 P.2d 1390 (1994) (aider and abettor need not be physically present when crime committed; sufficient evidence to support defendant's attempted rape conviction).

## Conclusion for Guilt Phase

For the reasons set forth above and in the opinion filed today in R. Carr's appeal, *State v. Carr*, 299 Kan. 1, 331 P.3d 544 (2014), we affirm J. Carr's capital murder conviction under Count 2. We reverse his three remaining capital murder convictions based on the alternative theories under K.S.A. 21-3439(a)(4) and (a)(6).

We affirm J. Carr's convictions on Counts 9 through 24. Because four pairs of these counts were charged in the alternative, this results in affirmance of 12 rather than 16 convictions.

The convictions based on Counts 25, 26, and 29 through 40 are void for lack of subject matter jurisdiction. We affirm the convictions based on Counts 27 and 28. We affirm J. Carr's conviction on Count 41. We reverse his conviction on Count 42 because it is multiplicitous with Count 41.

We affirm J. Carr's convictions on Counts 43 through 55.

PENALTY PHASE

The general factual and procedural background for the penalty phase issues in this case is set out in full in the R. Carr opinion. We need not repeat it or supplement it here. In addition, nearly all penalty phase legal issues raised by J. Carr are discussed as needed and disposed of in the R. Carr opinion. We therefore merely list them with accompanying short responses.

P1. Did the district judge err in refusing to sever the penalty phase of defendants' trial? A majority of six members of the court answers this question yes for reasons explained in Section P1 of the R. Carr opinion and because of the family circumstances argument raised by J. Carr. The majority also relies on the prejudice to J. Carr flowing from R. Carr's visible handcuffs during the penalty phase. One member of the court dissents and writes separately on this issue. A majority of six members of the court agrees that this error requires J. Carr's remaining death sentence to be vacated, consistent with Section P1 of the R. Carr opinion. One member of the court dissents and writes separately on this issue.

P2. Despite compliance with K.S.A. 21-4624(a), was it constitutional error to omit the four aggravating circumstances asserted by the State from the complaint? To provide guidance on remand, the court unanimously answers this question no for reasons explained in Section P2 of the R. Carr opinion.

P3. Did the four aggravating circumstances asserted by the State adequately channel the jury's discretion in arriving at the sentence of death? To provide guidance on remand, the court unanimously answers this question yes for reasons explained in Section P3 of the R. Carr opinion.

P4. Does the unavailability of a transcript of the jury view deprive J. Carr of a meaningful opportunity for appellate review of his death sentence? To provide guidance on remand, the court unanimously answers this question no for reasons explained in Section P4 of the R. Carr opinion.

P5. Does K.S.A. 21-4624(c)'s allowance of testimonial hearsay (a) offend the heightened reliability standard applicable in death penalty cases, or (b) violate the Confrontation Clause of the United

State Constitution and *Crawford v. Washington*, 541 U.S. 36, 56, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)? To provide guidance on remand, the court unanimously answers the first question no for reasons explained in Section P5 of the R. Carr opinion. To provide further guidance on remand, the Court unanimously answers the second question yes for reasons explained in Section P5 of the R. Carr opinion.

P6. Did the district judge err in excluding mitigating evidence of (a) likelihood of parole, or (b) the anticipated impact of J. Carr's execution? To provide guidance on remand, the court unanimously answers the first question no for reasons explained in Section P6 of the R. Carr opinion. To provide further guidance on remand, in Section P6 of the R. Carr opinion, the court discusses the standard that should govern consideration if the second question arises again.

P7. Did the district judge err by permitting the State's rebuttal witness to testify that he had consulted other experts and that they agreed with his opinion? To provide guidance on remand, in Section P7 of the R. Carr opinion, the court discusses the standard that should govern consideration if this question arises again.

P8. Did the district judge err in denying an opportunity for surrebuttal testimony? For reasons explained in Section P8 of the R. Carr opinion, the court unanimously agrees that the district judge abused his discretion. The court declines to reach the issue of harmlessness because of the necessity of remand.

P9. Must J. Carr's sentencing on his noncapital convictions have occurred before the penalty phase of his trial, and, if so, should the jury have been informed of the sentences he would serve if he were not sentenced to death? For reasons explained in Section P9 of the R. Carr opinion, the court declines to reach the merits of the first part of this question because it is moot and, to provide guidance on remand, unanimously answers the second part of the question no.

P10. Did the district judge err in failing to instruct the jury that the existence of mitigating factors need not be proved beyond a reasonable doubt? To provide guidance on remand, for reasons explained in Section P10 of the R. Carr opinion, a majority of five

members of the court answers this question yes. Two members of the court dissent, and one of them writes separately for the two on this issue.

P11. Did the district judge err by failing to instruct jurors that "the crime" to be considered when evaluating aggravating circumstances was capital murder? In Section P11 of the R. Carr opinion, we discuss this issue to provide guidance on remand.

P12. Was the jury instruction on the role of mercy clearly erroneous? To provide guidance on remand, for reasons explained in Section P12 of the R. Carr opinion, the court unanimously answers this question no.

P13. Did the wording of Instruction 10, when read with the verdict forms, misstate the law on the need for jury unanimity on mitigating factors not outweighing aggravating factors? To provide guidance on remand, for reasons explained in Section P13 of the R. Carr opinion, the court unanimously answers this question yes.

P14. Must J. Carr's death sentence be vacated because a fact necessary to imposition of the penalty—his age of 18 or older at the time of the capital crimes—was not submitted to the jury or found beyond a reasonable doubt? For reasons explained in Section P14 of the R. Carr opinion, the court declines to reach the merits of this issue because the situation that prompted it is unlikely to arise again on remand.

P15. Does K.S.A. 21-3205 authorize punishing an aider and abettor the same as a principal? In Section P16 of the R. Carr opinion, the court declines to reach the merits of this issue because the record on appeal does not demonstrate that R. Carr was convicted of capital murder as an aider and abettor. This is also true of J. Carr, and no further discussion of the issue is warranted in this opinion.

P16. Is the death penalty an unconstitutionally disproportionate punishment as applied to aiders and abettors of capital murder under Section 9 of the Kansas Constitution Bill of Rights? In Section P17 of the R. Carr opinion, the court declines to reach the merits of this issue because the record on appeal does not demonstrate that R. Carr was convicted of capital murder as an aider

and abettor. This is also true of J. Carr, and no further discussion of the issue is warranted in this opinion.

P17. Was the penalty phase infected by prosecutorial misconduct? J. Carr argues that one prosecutor's multiple references to his unadjudicated criminal conduct and his jailhouse bragging about shooting the Birchwood victims and the crude reason for raping one of the female victims were misconduct. Even though one such reference during closing argument was the subject of a successful objection and an order for the jury to disregard it, J. Carr argues the damage was incurable. Defense counsel's earlier objection suggesting that the prosecutor could not refer to such material without being able to "prove it up" had been overruled. This objection probably should have been sustained by Judge Clark. See *State v. McCaslin*, 291 Kan. 697, Syl. ¶ 12, 245 P.3d 1030 (2011) (prosecutor, once challenged, must demonstrate good faith basis for facts underlying questions, argument). For reasons explained in Section P18 of the R. Carr opinion, the court declines to reach the further merits of this issue because the situations that prompted it are unlikely to arise again on remand.

P18. Do verdict forms such as those used in this case pose a threat of double jeopardy? For reasons explained in Section P19 of the R. Carr opinion, the court declines to reach the merits of this issue because it is unripe.

P19. Does Kansas' execution protocol protect against unnecessary pain? For reasons explained in Section P20 of the R. Carr opinion, the court declines to reach the merits of this issue because it is unripe.

## Conclusion for Penalty Phase

Because the district judge's failure to sever the penalty phase of defendants' trial violated J. Carr's Eighth Amendment right to an individualized sentencing determination and cannot be deemed harmless error, the death sentence for J. Carr's remaining K.S.A. 21-3439(a)(6) conviction for the murders of Heather M., Aaron S., Brad H., and Jason B. is vacated. The case is remanded to the district court for further proceedings consistent with this opinion.

* * *

BEIER, J., concurring in part and dissenting in part: I respectfully dissent from two of the majority's rulings on the guilt phase of Jonathan Carr's trial: cumulative error and sufficiency of evidence on Count 41.

As discussed in my separate opinion in Reginald Carr's appeal, *State v. Carr*, 299 Kan. 1, 315, 331 P.3d 544 (2014) (Beier, J., concurring in part and dissenting in part), two of the district judge's errors—failure to sever the guilt phase of the defendants' trial and rejection of the reverse *Batson* peremptory challenge—may have been reversible standing alone. Even if the court is unwilling to go that far today, when these two errors are considered with the six other J. Carr errors upon which the court unanimously agrees— erroneous instructions on the sex-crime based capital murders, multiplicity of the multiple-homicide based capital murders, lack of subject matter jurisdiction for the victim-on-victim sex charges, automatic exclusion of expert testimony on the reliability of eye-witness identifications, erroneous instruction on eyewitness certainty, and erroneous instruction on aiding and abetting—and Judge Paul Clark's refusal to grant J. Carr's motion for mistrial after opening statements, reversal of all of J. Carr's convictions under the cumulative error doctrine is unavoidable. Despite weighty evidence, there was simply too much pervasive and interrelated error in the guilt phase of J. Carr's trial for me to be confident in the outcome.

I also would hold, for the reasons stated in my separate opinion in the R. Carr appeal, that the evidence supporting Holly G.'s digital self-rape under Count 41 was insufficient to convict J. Carr as a principal. This would mean that Count 42 can stand, rather than being reversed as multiplicitous.

LUCKERT, and JOHNSON, JJ., join the foregoing concurring and dissenting opinion.

* * *

JOHNSON, J., concurring in part and dissenting in part: I join the separate opinion authored by Justice Beier, but I write separately because I believe that the district court erred in refusing to change

the venue of the trial and that this defendant's felony murder conviction should be reversed for want of sufficient evidence.

The district court ignored statistically valid evidence that prejudice against the defendant was pervasive throughout Sedgwick County to the extent that one could not expect to find an unbiased jury pool in that community. My rationale in this case is the same as set forth in my separate opinion in codefendant Reginald Carr's opinion, which I adopt here by reference. See *State v. Carr*, 299 Kan. 1, 321, 331 P.3d 544 (2014) (Johnson, J., concurring in part and dissenting in part).

Specific to this case, however, I cannot find in the record sufficient competent evidence from which a rational jury could have found J. Carr guilty beyond a reasonable doubt of the felony murder of Linda Ann Walenta. Instead of basing its prosecution upon proven facts and the relevant inferences that could reasonably be drawn from those *proven* facts, the State relied on speculation as to what might have happened. *Cf. State v. Spear*, 297 Kan. 780, 791, 304 P.3d 1246 (2013) (quoting *United States v. Spirk*, 503 F.3d 619, 623 [7th Cir. 2007]) (acknowledging that "many courts have observed that '[a] guess is not proof beyond a reasonable doubt' ").

As with the change of venue issue, the sufficiency of the evidence issue involves the defendant's constitutionally guaranteed individual rights. The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires the State to prove, beyond a reasonable doubt, each and every element necessary to constitute the crime charged. *State v. Gould*, 271 Kan. 394, 411, 23 P.3d 801 (2001). While that right emanates from the "people's document," the constitution, its enforcement will not always be publicly applauded. Nevertheless, it is incumbent upon this court to make the State comply with its constitutional burden of proof, without regard to the popularity of the result.

As the majority notes, the defense complains of impermissible "inference-stacking." 300 Kan. at 366. This court has previously tried to explain that prohibition by stating that "inferences may be drawn only from facts established," that is, inferences may not rest upon another inference. *State v. Williams*, 229 Kan. 646, 649, 630 P.2d

694 (1981). But here, the majority appears to focus on its notion of the difference between direct evidence and circumstantial evidence, which leads it to recite the familiar mantra that even the most serious crime may be proved by circumstantial evidence. Then, the majority declares that circumstantial proof is not the same as impermissible inference-stacking. 300 Kan. at 366.

Certainly, I cannot quibble with the notion that just because the State's case is based on circumstantial evidence does not mean that the State is relying on impermissible inference-stacking. But that statement does not answer the question presented here. We are looking at the quality of the evidence, rather than the type of evidence. To support a conviction, the evidence must be *competent* evidence, even if it is circumstantial in nature. In *Williams*, 229 Kan. at 648, we noted that "[c]onvictions based upon circumstantial evidence . . . can present a special challenge to the appellate court" when reviewing the sufficiency of the evidence because we only permit juries "to draw *justifiable* inferences from proven circumstances and established facts." *Williams* set forth an alternative explanation of the prohibited practice of inference-stacking by specifically placing it in the context of circumstantial evidence: " '[W]here reliance is placed upon circumstantial evidence, the circumstances in question must themselves be proved and cannot be inferred or presumed from other circumstances.' " 229 Kan. at 649 (quoting 1 Wharton's Criminal Evidence § 91, pp. 150-51 [13th ed. 1972]). Here, to get to the circumstances that would support a reasonable inference that the defendant committed the crime of felony murder, one has to make presumptions and inferences from other circumstances.

When reviewing whether the record contains substantial competent evidence, I find it helpful to first review what elements or claims the State was required to prove in order to obtain a constitutional conviction on the charged crime. As noted, the charged crime was felony murder, the definition of which is located in the first-degree murder statute and requires "the killing of a human being committed . . . in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto." K.S.A. 21-3401(b). In this case,

the State alleged that the underlying felony was an attempt to commit aggravated robbery upon Walenta. "Robbery is the taking of property from the person or presence of another by force or by threat of bodily harm." K.S.A. 21-3426. That crime is an aggravated robbery if the robber is armed with a dangerous weapon or inflicts bodily harm upon a person during the robbery. "An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 21-3301(a).

But the State did not allege that J. Carr killed Walenta or that he attempted to rob her. Rather, the State's felony-murder prosecution of J. Carr was based on the theory that he aided and abetted his brother, R. Carr, who was the person that killed Walenta while attempting to rob her. K.S.A. 21-3205(1) provides that "[a] person is criminally responsible for a crime committed by another if such person *intentionally* aids, abets, advises, hires, counsels or procures the other to commit the crime." (Emphasis added.) To be criminally responsible, a defendant must aid and abet the principal either before or during the commission of the crime and, most importantly, the aider and abettor must possess the intent to promote or assist in the commission of the charged crime. PIK Crim. 3d 54.05. Mere association with the principal who actually committed the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider and abettor. *State v. Green*, 237 Kan. 146, 149, 697 P.2d 1305 (1985); see Comment, PIK Crim. 3d 54.05. In other words, one is not criminally responsible for accidentally aiding and abetting the commission of a crime; the defendant has to know that the principal is going to commit the charged crime and possess the same criminal intent as the principal in order to be convicted of that crime as an aider and abettor.

With the foregoing in mind, the prosecutor's theory of prosecution in this case required the State to prove to the jury beyond a reasonable doubt that J. Carr intentionally drove R. Carr to the site of the crime, with the intent to promote or assist R. Carr in taking property from Walenta by force or by threat of bodily injury while armed with the handgun that J. Carr may or may not have

provided, and that during the armed robbery attempt, R. Carr killed Walenta.

The obvious first hurdle for the prosecution was that it had absolutely no proof that R. Carr was attempting an aggravated robbery when he shot Walenta, rather than attempting a kidnapping or even murder. If his brother was not attempting an aggravated robbery, then J. Carr could not have been criminally responsible for felony murder based on aiding and abetting a nonexistent underlying felony. Nevertheless, I will continue the analysis as if R. Carr was attempting an aggravated robbery.

At this point, it might be helpful to briefly discuss the difference between circumstantial evidence and direct evidence. The dictionary definition of "direct evidence" is particularly germane here because it also places the term in the context of an inference or presumption, to-wit: "Evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." Black's Law Dictionary 675 (10th ed. 2014). Ironically, the majority provides an excellent example of the difference.

After describing Walenta's personal observation that the gunman emerged from the passenger seat of a light-colored car which pulled away from its parking place immediately after the shooting, the majority declares that "[a] juror need only make one inference from these facts to arrive at a finding that there was another person driving the car that followed her." Slip op. at 36. Walenta's statement of what she personally knew from her own observation was direct evidence of the following facts: The gunman exited from the passenger side of a vehicle; the vehicle was light-colored; and the vehicle pulled away from its parking place immediately after the shooting. One need draw no inference or make any presumption for those facts to be established. But the conclusion that someone other than the gunman was the driver of the vehicle is circumstantial evidence. It is only proved by inferring or presuming from Walenta's direct testimony that if the gunman was the only person in the vehicle, it could not have pulled away without the gunman being in the vehicle.

But, of course, the direct evidence from Walenta does not establish the elements of felony murder against J. Carr. The only other persons who were in a position to personally observe the crime and have personal knowledge of any fact that would not require an inference or presumption for proof are the gunman and vehicle driver, alleged to be R. Carr and J. Carr. Neither brother testified or gave a statement admitting that J. Carr drove the car to assist R. Carr in an armed robbery. Even the permissible inference from direct evidence that the majority points out—that someone other than the shooter was driving the car—is insufficient to prove the elements of felony murder outlined above. To get to the elements of the crime, one will need more circumstantial evidence from which to draw reasonable inferences.

In my view, a circumstance that was absolutely essential for the prosecution to establish to permit a rational jury to convict J. Carr of felony murder based upon the State's theory of prosecution was that J. Carr was driving the light-colored car that Walenta observed. But that circumstantial evidence—that J. Carr was driving the light-colored car—was not established with proven facts. There was no witness that identified J. Carr as the vehicle driver. No witness even saw the driver to be able to provide a description that could be matched against J. Carr.

The only way to establish that J. Carr was driving the car used in the crime is to presume that circumstance based upon other circumstantial evidence. For instance, Tronda Adam's testimony placing J. Carr with R. Carr not long after Walenta was shot is not direct evidence that they were together during the shooting. Contrary to the majority's characterization, that testimony was circumstantial because Adams did not personally observe the brothers commit the crime together. To be relevant to J. Carr's prosecution for felony murder, the jury had to infer that, if the brothers were together after the shooting, they must have been together during the shooting. Then, from the circumstance that the brothers were together during the shooting, the jury would need to infer that J. Carr was driving the light-colored car at the scene of the crime. From the circumstance that J. Carr was driving the vehicle at the scene of the crime, the jury would have to infer that he was doing

so in order to knowingly promote or assist his brother in the commission of a crime. And because the State said so, the jury would need to infer or presume that the intended crime was aggravated robbery, rather than some other crime such as kidnapping. If that is not inference-stacking, I must confess that the concept must be incomprehensible to me.

Likewise, the testimony describing the vehicle the brothers were using the day of the shooting required further presumptions and inference-stacking by the jury, notwithstanding the majority's emphatic denial that it did. Adams did not see the brothers in the car together at the scene of the Walenta killing. Therefore, her testimony did not prove a fact that was relevant to the felony-murder elements without a further inference or presumption, *i.e.*, it was not direct evidence. Pointedly, no witness provided information, such as a license tag number, from which the owner of the light-colored car at the crime scene could be determined. No one even described the make and model of the car carrying the gunman. All the jury could do with Adams' testimony was to speculate that the light-colored car observed by Walenta was the same car that Adams saw the brothers in at other times and further infer that the brothers were still together in that car at the crime scene, and further presume that the unseen driver of the light-colored car at the scene of the crime was J. Carr, who presumably was knowingly assisting his brother in committing an aggravated robbery.

Likewise, Adams' testimony about the gun does nothing to boost the State's case. Her "direct observations" about what transpired with the weapon at times other than the shooting, provides absolutely no insight into the elements of the felony-murder charge, unless the jury simply guesses that J. Carr must have given the weapon to R. Carr and then presume that, in doing so, J. Carr knew that R. Carr was planning to use the weapon to commit an aggravated robbery.

Even if one eschews the term "inference-stacking," I cannot find that the jury had sufficient proven circumstances and established facts to justify an inference that J. Carr aided and abetted the felony murder of Walenta. Without sufficient competent evidence to sup-

port a constitutionally valid conviction, this court has no choice but to reverse the conviction.

Before concluding, however, I want to briefly discuss my worst nightmare, *i.e.*, that our inference-stacking, guilt-by-association, character-propensity-reasoning decision in *State v. McBroom*, 299 Kan. 731, 325 P.3d 1174 (2014), would be applied beyond its facts as establishing precedent for upholding convictions based upon insufficient evidence. The majority cites to *McBroom* to support its declaration that "the evidence against J. Carr on the Birchwood incident would naturally have reinforced the evidence on the Walenta incident." 300 Kan. at 366. Why do I find that reasoning faulty? Let me count the ways.

First, I would find that it would be quite *unnatural* for the jury to use the evidence on one charge to reinforce or influence its decision on another charge, because the trial judge specifically told the jurors not to do that. PIK Crim. 3d 68.07, which the judge followed in jury instruction No. 3, instructs a jury as follows:

"Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged. Your finding as to each crime charged must be stated in a verdict form signed by the Presiding Juror."

Second, as noted above, mere association with a principal actor is insufficient to establish criminal responsibility as an aider and abettor, even if the defendant is also merely present at the crime scene. Accordingly, guilty-by-association at another crime scene cannot comport with the constitutional requirement for the State to prove each and every element of the charged crime beyond a reasonable doubt.

Third, we at least pay lip service to the notion that juries should not be permitted to convict a defendant based upon character propensity reasoning. See Comment, *Other Misconduct Evidence: Rethinking Kansas Statutes Annotated Section 60-455*, 49 Kan. L. Rev. 145, 146 (2000).

"In the criminal context, the State cannot present evidence that a defendant committed a specific bad act on another occasion solely to establish a bad character

propensity as proof that the defendant must have committed the currently charged crime, *i.e.*, defendant did bad before, therefore defendant must have done bad now." *State v. Coburn*, 32 Kan. App. 2d 657, 671-72, 87 P.3d 348 (Johnson, J., concurring), *rev. denied* 278 Kan. 848 (2004).

That is precisely the reasoning the majority is using; J. Carr did bad at the Birchwood incident so he must have done bad at the Walenta incident.

Fourth, "[u]nder our theory of criminal jurisprudence in this nation, the defendant is clothed with a presumption of innocence until he is proven to be guilty beyond a reasonable doubt by the State." *Williams*, 229 Kan. at 663-64. Allowing the State to use evidence of one crime to "reinforce" its proof of another crime denigrates the defendant's presumption of innocence. In other words, presuming that a defendant did the charged crime because there is evidence that he committed another crime sounds more like bad people are clothed with a presumption of guilt.

Fifth, as I noted above, the State is constitutionally required by the Fourteenth Amendment to prove each and every element necessary to constitute the *charged crime* beyond a reasonable doubt. Allowing the State's proof of the charged crime to rely on its having proved another crime reduces its constitutional burden of proof and violates the defendant's right to due process.

Finally, it is no answer to say that the jury has spoken and an appellate court should not interfere with that decision. To the contrary, our failure to interfere when presented with a constitutional violation is an abdication of our role in the justice system. The jury is a factfinder; it is not charged with the responsibility (or authority) to decide constitutional questions. Where the jury's factfinding exceeds constitutional boundaries, such as where it convicts a defendant for the charged crime based upon evidence that the defendant committed another crime, this court must rectify the violation.

In sum, the defendant's conviction for felony murder was unsupported by substantial competent evidence and should be reversed.

\* \* \*

BILES, J., concurring in part and dissenting in part: I agree Jon-

athan Carr's sentencing must be reversed and remanded for new proceedings because the district court failed to sever the cases following the convictions. I write separately to note my disagreement with the majority's dicta in which it adopts a section in Reginald Carr's opinion entitled "P10. Burden of Proof on Mitigating Factors." 300 Kan. at 369-70. The majority holds J. Carr's sentence was imposed in violation of the Eighth Amendment to the United States Constitution because the district court failed to explicitly instruct the jury that mitigating circumstances need not be proven beyond a reasonable doubt. I disagree.

As noted in more detail in my dissent in *State v. Gleason*, 299 Kan. 1127, 1210, 329 P.3d 1102 (2014), the majority's conclusion defies the United States Supreme Court's established Eighth Amendment jurisprudence and lacks any persuasive analysis articulating why the circumstances in this case justify a departure from that precedent. The issue for Eighth Amendment purposes is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990). The majority's conclusion is that a per se violation of the Eighth Amendment occurs if a jury instruction correctly states that the State bears the burden of proving aggravating circumstances beyond a reasonable doubt but fails to affirmatively state that mitigation evidence need not be proven beyond a reasonable doubt.

But this alone cannot justify reversal under controlling Eighth Amendment precedent. See *Kansas v. Marsh*, 548 U.S. 163, 173, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006); *Walton v. Arizona*, 497 U.S. 639, 651, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002); see also *Smith v. Spisak*, 558 U.S. 139, 130 S. Ct. 676, 175 L. Ed. 2d 595 (2010) (instructions and jury forms at penalty phase did not violate Eighth Amendment by requiring jury unanimity as to existence of mitigating factors; instructions and forms did not explicitly advise jury mitigating circumstances need not be unanimously found). The next step must be to decide in the absence of the instruction whether there is a

reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. The majority is wrong when it cuts the analysis short and concludes the failure to simply instruct the jury on mitigation forces an automatic reversal. Slip op. at 378.

The Eighth Amendment does not compel our directive in *State v. Kleypas*, 272 Kan. 894, 1078, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), that any mitigating circumstance instruction must inform the jury that mitigating circumstances need not be proven beyond a reasonable doubt. See *Marsh*, 548 U.S. at 173 (holding *Walton* compelled conclusion Kansas capital sentencing scheme satisfied Eighth Amendment requirements because Kansas scheme was functionally identical to scheme found constitutional in *Walton*, except it provided benefit to defendants by placing no evidentiary burden on them). A finding that J. Carr's jury instructions did not conform to the *Kleypas* requirement is not an adequate basis for concluding J. Carr's federal Eighth Amendment rights were violated and reversal is required.

I dissent from that portion of the opinion.

MORITZ, J., joins the dissenting portion of the foregoing concurring and dissenting opinion.

\* \* \*

MORITZ, J., concurring in part and dissenting in part: I write separately for several reasons, all of which are fully explained in the Reginald Carr appeal, *State v. Carr*, 299 Kan. 1, 329, 331 P.3d 544 (2014). Rather than repeat that full explanation here, I will simply summarize those points on which I concur with and dissent from the majority opinion.

First, I concur because while I agree with the majority's decision to affirm Jonathan Carr's convictions, including one capital murder conviction, I disagree with the majority's conclusion that the district court abused its discretion in refusing to sever the defendants' guilt phase trial. Even considering the joinder as error, however, I believe the majority properly finds any errors in the conviction phase harmless and Jonathan Carr's cumulative error argument unpersuasive. Therefore, I concur with the majority opinion affirm-

ing Jonathan Carr's convictions, including one capital murder conviction.

Second, and more significantly, I dissent from the majority's decision to reverse and remand Jonathan Carr's death sentence. I would find the district court did not err in refusing to sever the defendants' penalty phase trial. But even considering a joinder error in the penalty phase, I would affirm the jury's imposition of the death penalty for Jonathan Carr. As more fully detailed in my concurring and dissenting opinion in Reginald Carr's appeal, 299 Kan. at 329 (Moritz, J., concurring in part and dissenting in part), I am convinced the mitigating evidence simply pales in comparison to the aggravating circumstances. I would hold beyond a reasonable doubt that the jury's decision to impose the death penalty was not attributable to any joinder error below.

Additionally, I join that portion of Justice Biles' separate opinion dissenting from the majority's "alternative" holding that the district court erred in failing to instruct the jury that mitigating circumstances need not be proven beyond a reasonable doubt.

Ultimately, I am convinced Jonathan Carr received a fair trial and the jury imposed a sentence of death because it understood that the horrendous circumstances called for that sentence. Because I would affirm Jonathan Carr's death sentence, I dissent.